Thane W. Tienson, OSB No. 773741
ttienson@landye-bennett.com
Jennifer L. Gates, OSB No. 050578
jgates@landye-bennett.com
Landye Bennett Blumstein, LLP
1300 SW 5th Avenue, Suite 3500
Portland, Oregon 97201
Phone: (503) 224-4100
Fax: (503) 224-4133

*Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON AT PORTLAND

| | |
|---|---|
| LNG DEVELOPMENT COMPANY, LLC d/b/a OREGON LNG,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>PORT OF ASTORIA, an Oregon Port; **DAN HESS**; an individual, **LARRY PFUND**; an individual, **WILLIAM HUNSINGER**, an individual, **JACK BLAND**, an individual, and **FLOYD HOLCOM**, an individual,<br><br>　　　　　　Defendants. | Case No. 3:09-CV-847 JE<br><br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS AND DEFENDANTS' ADDITIONAL STATEMENT OF MATERIAL FACTS** |

Pursuant to L.R. 56.1(b), defendants respond to Plaintiff's Concise Statement of Material Facts Supporting Summary Judgment as follows:

1.　ADMIT.

2.　ADMIT.

3.　ADMIT that SNG filed for bankruptcy and the Sublease was assigned to OLNG by court order, but DENIES that it was done with the Port's consent.

4.　DENY. There are material differences between the provisions of the Upland Lease (referred to by plaintiff as the Master Lease) and Sublease.

Page 1 -　DEFS' RESPONSE TO PLAINTIFF'S CONCISE STATEMENT OF MATERIAL
　　　　　FACTS AND ADDITIONAL CONCISE STATEMENT OF MATERIAL FACTS

*538472.doc 08881-003*

5. DENY. The Upland Lease and Sublease both initially contained a five-year term followed by two 30-year renewal options, but the Upland Lease has been amended and now contains an initial seven-year term.

6. DENY. The Port is obligated to maintain its Upland Lease with the DSL which allows the plaintiff to have the full benefit of its Sublease provided it is not in material breach, and the Port has done so.

7. ADMIT, assuming that the assignment was proper, that on April 24, 2009, OLNG timely notified the Port of its intent to exercise its 30-year renewal option provided for in the Sublease.

8. ADMIT only insofar as to be fully effective, the Sublease must be approved by the State of Oregon, as well as the Port, and the DSL has not been made a party to this action and has not approved the renewal and therefore it is not effective.

9. ADMIT.

10. ADMIT.

11. Defendants have made reasonable inquiry and cannot admit or deny the truthfulness of Paragraph 11 because the issue of whether or not the plaintiff was in material default cannot be determined with reasonable inquiry.

12. ADMIT.

### DEFENDANTS' ADDITIONAL CONCISE STATEMENT OF MATERIAL FACTS

Defendants submit the following additional relevant material facts necessary for the Court to determine Plaintiff's Motion for Partial Summary Judgment.

13. The State of Oregon, by and through DSL, was required by the Upland Lease to approve any Sublease, and DSL did approve the original Sublease with Skipanon Natural Gas LLC (SNG). *Ex. 1 to the Amended Complaint, ¶ 12.2; Ex. 2 to the Amended Complaint, p. 37 of 40.*

//////

Page 2 - DEFS' RESPONSE TO PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS AND ADDITIONAL CONCISE STATEMENT OF MATERIAL FACTS

*538472.doc 08881-003*

14. The Upland Lease never references or contemplates the Sublease or any terms therein. *Ex. 1 to the Amended Complaint.*

15. DSL is required to provide prior written consent to any renewal of the Sublease, which necessarily includes the 30-year renewal option in the Sublease. *Ex. 1 to the Amended Complaint, ¶ 12.2(b).*

16. Any renewal of the Sublease by the plaintiff therefore cannot be effective without the State's written consent. *Id.*

17. DSL has not provided prior written consent to the 30-year renewal of the Sublease. *Hunsinger Dec., ¶ 6.*

18. The State of Oregon, by and through DSL, was not made a party to this lawsuit. *Amended Complaint, p. 1.*

19. There are some significant differences in the language between the provisions of the Sublease between the Port and plaintiff's predecessor-in-interest, and the Upland Lease between the DSL and the Port, and those differences include the following:

    a. Section 5.1 of the Upland Lease dealing with "Approved Uses" provides, in pertinent part, that the premises are to be improved, used and maintained by the Port for their construction and development of "the Golf Course and Marine Industrial Facilities and for no other purpose...." Further, § 12.2 of the Upland Lease restricts all Subleases to those same narrow "Approved Uses" and also requires DSL's prior written consent to all Subleases, as well as to all renewals of such Subleases. *Corr Dec., Ex. 1, pp. 7, 19-21.*

    b. The Upland Lease defined "Golf Course" to mean an "18-hole Golf Course and related Golf Course amenities such as a pro shop, Golf Course maintenance facilities, and driving range developed on the Premises." The Upland Lease defined "Marine Industrial Facilities" as "those facilities and structures associated with Marine Industrial purposes; *i.e.*, the LNG import facility," and, in turn,

Page 3 -   DEFS' RESPONSE TO PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS AND ADDITIONAL CONCISE STATEMENT OF MATERIAL FACTS

*538472.doc 08881-003*

    defined "Marine Industrial Purposes" to mean only "the construction and operation of a Liquified Natural Gas (LNG) importing, shipping, berthing, storage and regasification facility." *Id., pp. 2-3.*

c.   However, in the Sublease, the term "Marine Industrial Purposes," unlike the Upland Lease, was defined much more broadly to mean: Maritime related activities and operations, including, but not limited to, foreign commerce, shipping, berthing, Liquified Natural Gas (LNG) importing, storage, and reclassification with associated natural gas pipelines and the Sublease excludes any definition of the term "Golf Course." *Corr Dec., Ex. 2, pp. 2-3 of 40.*

d.   In addition to the differences between the Upland Lease and Sublease as identified above, there is another difference between them located in § 5.2 of Article V under "Uses of the Premises." Section 5.2 of the Upland Lease provides that the Tenant Port is to comply at all times with the Master Development Plan, calling for the construction of an 18-hole golf course and LNG import facility, and that "…failure to comply with the terms and conditions of the Plan will be a material breach of the Lease." Paragraph 5.2 of the Sublease contains no such provision and instead provides that "the Master Development Plan will provide for the best use of the Land and ensure that sufficient land is available to the Marine Industrial Facilities to allow it to meet all of its permit requirements." *Corr Dec., Ex. 1, pp. 7-8; Ex. 2, p. 9 of 40.*

e.   Accordingly, the Sublease, unlike the Upland Lease and contrary to ¶ 5.2 of the Upland Lease, did not restrict or require that the Approved Uses of the property be limited to development of an 18-hole golf course and LNG import facility, but instead, by incorporating the broader definition of "Marine Industrial Purposes" as set forth in the Sublease and ignoring altogether the obligation to develop an 18-hour golf course, the Sublease, contrary to the provisions of the Upland Lease,

Page 4 - DEFS' RESPONSE TO PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS AND ADDITIONAL CONCISE STATEMENT OF MATERIAL FACTS

*538472.doc 08881-003*

allowed for the construction and development of any type of marine industrial facility, not just an LNG import facility. *Corr Dec., Ex. 1, p. 7; Ex. 2, p. 2 of 40.*

20. The provisions of the Sublease between the Port and the plaintiff's predecessor-in-interest, Skipanon Natural Gas LLC (SNG), were negotiated on behalf of the Port by its former Executive Director Peter Gearin, and did not involve input from the Port Commissioners. *Hess Dec., ¶ 15.*

21. The November 3, 2004 Staff Report that was issued to the Port Commissioners in conjunction with the request to approve entry into the Upland Lease and Sublease, as well as the information provided to Commissioners in Executive Session, both informed Commissioners that the permitting process for the operation of an LNG import facility would take two to three years, and that initial five-year Lease period would therefore provide enough time to the Sublessee to determine whether the LNG import facility project was feasible. *Hess Dec., ¶¶ 6-9, Ex. A, pp. 10-13; Ex. B, pp. 1-3.*

22. In order to construct and operate an LNG import facility in the State of Oregon, an applicant is required to receive permits, certifications, and/or approvals from several governmental agencies and public bodies. Those agencies and public bodies include, but are not limited to, the Federal Energy Regulatory Commission (FERC), the State of Oregon, and the City of Warrenton and Clatsop County. *Tienson Dec., ¶ 6.*

23. It will likely be an additional two years before the plaintiff can determine whether or not it will be able to obtain all necessary permits for operation of an LNG import facility. *Hess Dec., ¶ 19; Hunsinger Dec., ¶ 7.*

24. At the time of the entry into the Upland Lease and Sublease, the Executive Director of the Port was Peter Gearin. *Gearin Dec., ¶ 1.*

25. A criminal investigation has been launched by the Oregon Department of Justice regarding the conduct of former Executive Director Peter Gearin in conjunction with the entry

//////

Page 5 -  DEFS' RESPONSE TO PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS AND ADDITIONAL CONCISE STATEMENT OF MATERIAL FACTS

538472.doc 08881-003

into the Upland Lease and Sublease which is the subject of this action, and that criminal investigation has not yet been concluded. *Hess Dec., ¶ 20; Hunsinger Dec., ¶¶ 3 and 4.*

26.  Peter Gearin was terminated by the Port in 2007 and subsequently convicted of felony misconduct in conjunction with his performance as Executive Director of the Port. *Hunsinger Dec., ¶ 3; Hess Dec., ¶ 20.*

27.  The Port and the DSL amended the Upland Lease to allow for an initial seven-year period on August 24, 2009 extending the initial Lease period until August 31, 2011, which acts to postpone any decision by the Port as to whether to exercise its 30-year renewal option until 2011. *Hunsinger Dec., ¶ 5.*

28.  The Upland Lease at issue in this action requires that the Port, as Lessee, restrict development of the Leased Premises to the construction and operation of an LNG import facility and 18-hole golf course. *Ex. 1 to the Amended Complaint, ¶ 5.1.*

29.  Both the Lease and Sublease required that there be a Master Development Plan submitted to the DSL within two years or by November 2006 that included an 18-hole golf course on the Leased Premises. *Ex. 1 to the Amended Complaint, ¶ 5.2, and Ex. 2 to the Amended Complaint, ¶ 5.2.*

30.  The Master Development Plans submitted to the DSL by both the Port and Calpine in November 2006 did not include any plan for the development of an 18-hole golf course and pointed at the zoning change successfully sought by Calpine's subsidiary and the named Subtenant, SNG, prohibited construction of a golf course on the Leased Premises. *Tienson Dec., Ex. "A", p. 2.*

31.  Calpine and SNG filed for bankruptcy protection in New York in 2006 and sought assignment of SNG's Sublease with the Port to the plaintiff. *Hess Dec., ¶ 17.*

32.  The Port Commissioners were informed they had no practical ability to fight or protest the assignment of the Sublease, but they were concerned about the potential financial risk to the Port posed by the assignment because of the risks of nonpayment of the monthly lease

Page 6 - DEFS' RESPONSE TO PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS AND ADDITIONAL CONCISE STATEMENT OF MATERIAL FACTS

*538472.doc 08881-003*

obligations and had the Port's legal counsel send a letter to the Bankruptcy Court expressing those concerns. *Hess Dec., ¶ 18.*

33.  On or about December 29, 2006, the Sublease was assigned to LNG Development Company, LLC by order of the United States Bankruptcy Court for the Southern District of New York. *Hess Dec,. ¶ 18; Tienson Dec., Ex. C.*

34.  In conjunction with that order and to respond to concerns voiced by the Port to the assignment, a written Guarantee was entered into on December 29, 2006 between the Port and Leucadia National Corporation, under the terms of which, *inter alia*, Leucadia National Corporation, as Guarantor, guaranteed the punctual and complete payment of taxes or rent due under Article 4 of the subject Sublease through November 4, 2009. Upon execution of the Guarantee, the Court withdrew its objections to the Assignment and did not object or appeal the action or decision relating to the transfer and assignment of the Sublease to LNG Development Company, LLC. *Hess Dec., ¶ 18, Ex. C.*

35.  The Port sought an extension of time from DSL regarding the 30-year renewal option contained in the Upland Lease for several reasons:  (1) It was concerned about the potential financial risk to the Port if the plaintiff failed to obtain approval to operate its proposed LNG import facility and then defaulted on its sublease payments, leaving the Port responsible for making 30 years of Lease payment with no tenant or source of revenue and (2) the pending criminal investigation. *Hunsinger Dec., ¶ 2; Tienson Dec., Ex. D.*

36.  The Port and Oregon LNG do not have an approved Master Development Plan with the DSL, and have no current plan to proceed with a development plan that includes an 18-hole golf course on the Skipanon site leased land. The Master Development Plan for Golf Course and Marine Industrial Uses submitted by Oregon LNG to the Port in March 2008 proposes a possible 9-hole golf course on land not subject to the Sublease located just south of the leased land. *Hunsinger Dec. ¶ 9; Tienson Dec., ¶ 2, Ex A.*

//////

Page 7 -  DEFS' RESPONSE TO PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS AND ADDITIONAL CONCISE STATEMENT OF MATERIAL FACTS

*538472.doc 08881-003*

DATED this 13th day of October 2009.

                LANDYE BENNETT BLUMSTEIN LLP

                By: /s/ Thane W. Tienson
                    Thane W. Tienson, OSB No. 773741
                    Jennifer L. Gates, OSB No. 050578
                    Counsel for Defendants