# SKIPANON PENINSULA PROPERTY

## MASTER DEVELOPMENT PLAN

## FOR

## GOLF COURSE AND MARINE INDUSTRIAL USES

Port of Astoria

Calpine Corporation

November 2006

EXHIBIT A
PAGE 1 OF 8

## 1.0 Requirement for Master Development Plan

In accordance with Section 5.2 of "Upland Lease Agreement of November 1, 2004" between the State of Oregon, Department of State Lands (State) and the Port of Astoria (Port) and also in accordance with Section 5.2 of "Sublease Agreement of November 5, 2004" between the Port and Skipanon Natural Gas, LLC (Skipanon), a Master Development Plan shall be developed by Port and Skipanon for the area leased (the Property) and submitted to State for State's approval before November 1, 2006. (See figure 1.)

> 5.2   **Master Development Plan for Golf Course and Marine Industrial Purposes.**
> Within two (2) years after the Commencement Date and prior to any Construction Work, Landlord and Tenant will develop and submit to State for State's approval a Master Development Plan to Govern Landlord's and Tenant's construction and development of the Golf Course and Marine Industrial Facilities on the Land. The Master Development Plan will provide for the best use of the Land and ensure that sufficient land is available to the Marine Industrial Facilities to allow it to meet all its permit requirements. Landlord and Tenant will make no material changes to the Master Development Plan without the prior written consent of State.

Figure 1: Excerpt from "Upland Lease Agreement of November 1, 2004"

## 2.0 Zoning

Subsequent to State, Port, and Skipanon entering into the above mentioned leases, efforts were undertaken to re-zone the Property to allow for its use for marine-industrial purposes such as an LNG terminal. Applications were made to the City of Warrenton's (City's) Planning Department, which recommended that the relevant changes be made to the City's Comprehensive Plan and its Zoning Map. Following the Planning Commission's approval of these recommendations, opponents of the proposed Skipanon Natural Gas facility appealed the Planning Commission's approval to the City Commission, which eventually approved the Planning Department's recommendations.

Project Opponents subsequently appealed to the Oregon Land Use Board of Appeals (LUBA) with a request that the City Commission's land-use related actions be overturned. This appeal was denied at which point the project opponents filed an appeal with the Oregon Court of Appeals, which affirmed LUBA's decision in early October of 2006.

As a result of the re-zoning effort, a mixed use of the Property would no longer be possible. The upland portion of the site was re-zoned from "Urban Recreational and Resort" (URR) to "Water Dependent Industrial" (I2) while the adjacent shorelands were re-zoned to Aquatic Development (A-1). The City of Warrenton does not permit the use of I2 land for a golf course. Also, it would not be possible to permit the construction of a golf course on the shorelands, some of which are high-quality wetlands, without significant wetlands mitigation efforts.

See Attachment A for a section of the City of Warrenton's Zoning Map.

It should be noted that those parts of the Skipanon Peninsula, which are located south of the Property have retained their original zoning (mostly URR) and as such they might still be used for recreational purposes and/or for wetlands mitigation for areas impacted by the construction of the Skipanon Natural Gas Facility. Once the design of this facility has been finalized with FERC input and State agency concurrence has been obtained to a required wetlands mitigation plan, the need for such wetlands mitigation can be accurately anticipated. At that time the best use of the remaining areas can then be established and planned for.

## 3.0 Planned Use of the Property

While a golf course development may still be an option for areas south of the Property, the Property will be utilized for the construction and operation of an LNG receiving, storage, processing, separation, and re-gasification facility. Prior to vaporization and injection into the interstate pipeline system the LNG will be processed in order for the resulting natural gas to meet pipeline specifications for composition and heating value. This includes removal of propane and butane, which will be stored in liquid form and shipped out via truck, barge, ship, or pipeline. Also, the natural gas will be diluted with inert nitrogen from an on-site air separation facility in order to match the combustion properties of the natural gas, which consumers are accustomed to receive.

In addition to these traditional LNG activities, it is possible that certain other LNG-related activities may be found here as described in Section 6.0 below.

## 4.0 Planned Use of Areas Upland of the Property

The Port of Astoria owns the area located south of the Property. This area was previously intended to be part of an 18-hole golf course development, which was to occupy the entire Skipanon Peninsula. Significant efforts went into the design and promotion of this golf course development and it was believed that a Korean developer would raise the necessary financing to launch the project. Unfortunately, financing never materialized and the project was shelved.

With the re-zoning of the Property there is no longer sufficient land available for an 18-hole golf course; however, a less ambitious 9-hole project may still be possible if financing can be found.

Attachment C illustrates a conceptual layout of such a 9-hole project. It is recognized that a 9-hole project adjacent to a saw mill and an LNG facility would not have the same commercial attractiveness as an 18-hole project without an LNG facility. However, it would still provide recreational benefits on both a local and a regional basis while obviously being significantly cheaper to construct. It should be noted that no entity has stepped forward with offers for financing of neither an 18-hole nor a 9-hole golf course at this location.

Significant portions of this area are also believed to hold great potential as created/enhanced wetlands. It appears that through enhancements with shallow trenches and contoured, submerged areas, significant salmon spawning habitat can be created. This Master Development Plan is not intended to address the detailed design and integration of a golf course and created/enhanced wetlands; however, such integration does indeed appear to be feasible. Accordingly, the conceptual layout in Attachment C is for illustration only. Further studies and detailed design efforts will be required in order to optimize both the golf course and the wetlands.

While a golf course does appear to be feasible at this location, the final use of this property may indeed not include such a golf course. Similar facilities already exist in the region and a commercial justification may not exist at this time and may not necessarily develop in the future.

## 5.0 LNG Facility Layout

A conceptual layout for the LNG facility is shown in Attachment B. It should be noted that this layout may change as a result of further engineering studies and FERC requirements as well as efforts to minimize wetlands impacts.

It should also be noted that this layout is based on the use of ambient air for vaporization of the LNG. While this very energy efficient concept is not new, its use in a tempered climate like Warrenton's is unusual and consumes a significant amount of space. In order to deliver the resulting natural gas to the interstate pipeline system at a temperature above freezing, the use of ambient air must be augmented with the use of fired super-heaters or with the use of waste heat from the facility's in-house power generation system. The current layout accommodates the space requirement associated with either design.

## 6.0 Public Access

Public access is currently not anticipated to be available to any portion of the Property. Wetlands areas will be preserved and/or created and maintained in accordance with agency instructions and it is expected that access limitations will be part of such instructions.

## 7.0 Additional Uses Contemplated on or Near the Property

Calpine has had preliminary discussions with a number of parties regarding activities relating to those traditionally found at an LNG receiving facility and Calpine is also aware that third parties have proposed certain uses. Calpine has not evaluated any of these activities in detail and further analysis would clearly be required. In the interest of

allowing for such uses, should they prove to be of benefit to the facility of the community, some of these uses have been included here:

   a. Nearby rearing of salmon in net-pens supplied with cold water from the LNG facility. This would allow for the retention of salmon fingerlings over the summer months, when dangerously high water temperatures otherwise force the premature release of salmon fingerlings.
   b. Biomass-based generation of power with the waste heat being utilized in the LNG facility.
   c. Gas fired generation facility for a county-wide Public Utilities District with waste heat deliveries to the LNG facility.
   d. Production of ice for use by the local fishing fleet and processing industry based on cold brine delivered by the LNG facility.
   e. Cold-storage of seafood and other products based on cold brine delivered by the LNG facility.
   f. Use of pre-heated water for hatchery purposes prior to its use for LNG-vaporization.
   g. Recapture and export of condensation for use in nearby industries

It should also be noted that some of these activities may not be permitted on the areas up-land of the Property. It is expected that appropriate re-zoning and permitting efforts will be performed by non-Calpine entities independently of the permitting processes required for the LNG facility.

EXHIBIT A
PAGE 5 OF 8

Attachment A: Section of Warrenton's Zoning Map: Skipanon Peninsula





EXHIBIT A
PAGE 6 OF 8

Attachment B – Conceptual Facility Layout



Attachment C – Conceptual 9-Hole Golf Course Layout





David B. Levant, Esq.  
Erin L. Eliasen, Esq.  
STOEL RIVES LLP  
600 University Street, Suite 3600  
Seattle, WA 98101  
Telephone: (206) 624-0900  
Facsimile: (206) 386-7500  

Response Deadline: December 29, 2006  
at 11:30 a.m. (EST)  
(By agreement)

Attorneys for Port of Astoria

IN THE UNITED STATES BANKRUPTCY COURT  
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
:
In re                                               :   Chapter 11
:
                                                    :   Case No. 06-60200 (BRL)
Calpine Corporation, *et al.*,                      :
                                                    :   (Jointly Administered)
         Debtors.                                   :
:
-------------------------------------------------------x

**RESPONSE OF THE PORT OF ASTORIA TO DEBTORS' MOTION AUTHORIZING SKIPANON NATURAL GAS, LLC TO ASSIGN A SUBLEASE AGREEMENT TO LNG DEVELOPMENT COMPANY, LLC**

The Port of Astoria (the "Port"), by and through its undersigned counsel, hereby respectfully submits this response (the "Response") to the above-captioned debtors' and debtors-in-possessions' (the "Debtors") motion authorizing Skipanon Natural Gas, LLC ("Skipanon") to assign a sublease agreement to LNG Development Company, LLC (the "Motion"). In support of its Response, the Port states as follows:

**FACTUAL BACKGROUND**

1.   On November 5, 2004, the Port, as landlord, and Skipanon, as tenant, entered into a sublease of premises located in Clatsop County, Oregon (the "Sublease").

EXHIBIT B  
PAGE 1 OF 4

2. The Port is a public entity that must give advance notice to the press and hold public meetings prior to taking any action, including authorizing counsel to represent it in these bankruptcy proceedings.

3. On December 20, 2005 the Debtors filed their voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to manage their businesses and property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed.

4. On December 18, 2006 the Debtors filed the Motion, seeking to assign the Sublease to LNG Development Company, LLC ("LNG"). The Motion discloses that LNG is an affiliate of Leucadia National Corporation ("LNC") and that LNC has provided an assignee guarantee of LNG's obligations under the Sublease. See Motion at ¶22. This guarantee, however, is solely for the benefit of Skipanon, and is not intended to, and does not, benefit the Port.

5. The Motion also states that LNC has approximately $5 billion in assets and is publicly traded on the New York Stock Exchange. See id.

6. In contrast, the financial wherewithal of LNG is not discussed in the Motion.

## RESPONSE

I. Additional Time is Needed
   for the Port to Evaluate the Motion

7. Because the Port is a public entity it cannot meet and make decisions without notifying the press of a potential decision and conducting a public meeting. While the Port has scheduled a public meeting for the evening of Thursday, December 28, 2006, to discuss the Motion, its deadline to respond to the Motion is set for the early morning of December 29th.

Such a tight timeframe will not allow the Port sufficient time to adequately determine citizen opinion and deliberate on a reasoned response to the Motion.

    8.    Accordingly, the Port respectfully requests that this Court adjourn the hearing on the Motion to a date no earlier than January 17, 2007.

II  <u>No Adequate Assurance of LNG's Performance Exists</u>

    9.    Under section 365(f)(2) of the Bankruptcy Code, a trustee may assign an unexpired lease of the debtor if, "(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." 11 U.S.C. § 365(f)(2)(B).

    10.    The Motion does not give the Port adequate assurance that LNG will be able to perform the obligations required by the Sublease. Accordingly, the Port has requested that LNC guarantee LNG's performance to, and for the benefit of, the Port. The Port has requested, and the Debtors and LNC have agreed, subject to reaching an agreement with the Port on the form of a guarantee agreement, that the following language be added to the order approving the Motion:

> LNC will guarantee LNG's obligations under the Sublease. Such guarantee will be in favor of and for the benefit of, and will be in form and substance reasonably satisfactory to, the Port of Astoria.

The parties have not yet reached an agreement on the form of the guarantee, but the Port is hopeful that they will be able to do so prior to a hearing on the Motion. In the event that the parties do not reach an agreement prior to any hearing on the Motion, the Port requests that the above language be included in the order approving the Motion.

## CONCLUSION

WHEREFORE, the Port respectfully requests that the Court (i) adjourn the hearing on the Motion to a date no earlier than January 17, 2007; (ii) require that LNC guarantee LNG's performance under the Sublease for the benefit of the Port; and (iii) grant such other and further relief as may be just and proper.

Dated: Seattle, Washington
December 28, 2006

By: /s/
David B. Levant, Esq.
Erin L. Eliasen, Esq.
STOEL RIVES LLP
600 University Ave., Suite 3600
Seattle, WA 98101
Telephone: (206) 624-0900
Facsimile: (206) 386-7500

Attorneys for the Port of Astoria

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re:<br><br>Calpine Corporation, et al.,<br><br>                Debtors. | )<br>)<br>) Chapter 11<br>)<br>) Case No. 05-60200 (BRL)<br>) Jointly Administered<br>) |

### ORDER AUTHORIZING SKIPANON NATURAL GAS, LLC TO ASSIGN A SUBLEASE AGREEMENT TO LNG DEVELOPMENT COMPANY, LLC

Upon the *Motion Authorizing Skipanon Natural Gas, LLC to Assign a Sublease Agreement to LNG Development Company, LLC* (the "Motion") [Docket No. __],[1] this Court finds and concludes that the Court has jurisdiction over the subject matter of the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; this is a core proceeding pursuant to 28 U.S.C. § 157(b); the legal and factual bases set forth in the Motion and on the record at the Hearing (if any) establish just cause for the relief granted herein; the relief requested in the Motion is in the best interests of the Debtors, their estates and their creditors; and notice of the Motion was sufficient, and no other or further notice need be provided; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

    1.    The Motion is granted, and any and all objections to the Motion that were filed or lodged with the Court are hereby overruled on their merits with prejudice.

    2.    The Assignment Agreement, attached to the Motion as **Exhibit C**, is hereby approved and is binding upon the parties thereto.

---

[1] Capitalized terms used but not defined herein shall have the meaning set forth in the Motion.

3. Skipanon is authorized and empowered to assign the Sublease to LNG pursuant to section 365(f)(2) of the Bankruptcy Code in accordance with the terms and conditions of the Assignment Agreement.

4. Pursuant to section 365(f) of the Bankruptcy Code, any provisions in the Sublease that prohibit, restrict or condition the assignment of the Sublease constitute unenforceable anti-assignment provisions that are void and of no force and effect, and the assignment of the Sublease shall not be a default thereunder.

5. The Court finds that LNG has provided adequate assurance of future performance such that assignment of the Sublease comports with the requirements of section 365(f)(2) of the Bankruptcy Code.

6. The Court finds that, as of the date of this Order, no defaults (monetary or otherwise) exist under the Sublease, and therefore that, as of the date of this Order, there are no monetary or non-monetary defaults under the Sublease that are required to be cured.

7. Upon consummation of the assignment of the Sublease, LNG shall be deemed to be substituted as a party to the Sublease and Skipanon shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Sublease.

8. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion and the Assignment Agreement.

9. The Debtors are authorized to execute and deliver and empowered to perform under, consummate and implement the Assignment Agreement and to deliver and execute all further documents and take all further actions appropriate or desirable to effectuate the transactions contemplated in the Assignment Agreement.

10. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

11. The requirement set forth in Local Rule 9013-1(b) that any motion or other request for relief be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

12. The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2006

/s/ Hon. Burton R. Lifland
UNITED STATES BANKRUPTCY JUDGE

**Tienson, Thane**

**From:** Tienson, Thane
**Sent:** Wednesday, May 27, 2009 5:34 PM
**To:** 'louise.c.solliday@dsl.state.or.us'
**Cc:** 'sen.betsyjohnson@state.or.us'; 'mark.f.schumock@doj.state.or.us'; 'Jack Crider'
**Subject:** Port of Astoria Upland LEASE Agreement 26311-LE Request for extension of time

Dear Louise,

. This serves to follow up my earlier telephone message . As I stated , I have been retained to represent the Port of Astoria in conjunction with several matters including the above Lease agreement with DSL. Steve Purchase recently met with Port officials and my partner David Bennett, who filled in for me while I was on vacation to discuss this issue. The results of that initial meeting with Mr.. Purchase were inconclusive. It is my understanding that the Port then asked for an extension of time to respond to DSL with regard to its intentions regarding the decision as to whether to exercise the first of two 30 year options for the lease and was given until this Friday to respond. With all due respect that is simply insufficient time to do so . For that reason , I am requesting that DSL give the Port a meaningful additional period of time to resume negotiations with DSL and Oregon LNG in order to allow the Port to perform due diligence to prudently determine whether to exercise its option,, including an assessment of whether the only tenant for the property , Oregon LNG ,will be able to obtain the requisite approvals and authorizations for the proposed LNG import facility at the East Skipanon leased Site.

As matters now stand , the Port is being pressured by Oregon LNG to exercise its option so that it , as the Port's tenant, can do likewise . The problem for the Port is that if Oregon LNG fails to obtain its necessary approvals down the road or for some other reason decides to walk away from the lease it can do so with impunity under the terms of its sublease while the Port cannot do the same under the terms of its lease with the State . The Port would be obligated to pay for the full 30 years of lease fees even though it has no tenant , This is manifestly unfair to the Port for several reasons. First , the Lease and sublease were jointly negotiated with DSL and Oregon LNG's predecessor in interest , Calpine, to provide for the construction of a golf course and LNG import facility and a ' pass through" annual lease fee which goes directly to DSL , with absolutely no benefit to the Port . In addition , DSL required the Port to quitclaim any claim it may have to ownership of the property in conjunction with those negotiations , again without any financial benefit to the Port. Third , DSL has no other prospective tenant for the property , and yet , according to Mr.. Purchase , is unwilling to directly lease the property to Oregon LNG , apparently for political reasons , insisting that the Port do so for the State's financial benefit . Curiously , the Port's sublease was not incorporated in the Lease nor was it referenced . It should be and the lease provisions should parallel those in the sublease so that if there is a termination of the sublease or default by its tenant , the Port is not forced to assume financial responsibility for the lease payments . In addition , the lease needs to mirror the terms of the sublease with respect to proposed usage of the site. Presently , the lease requires that the use be restricted to a golf course and LNG import facility , but the sublease allows for any marine industrial use and does not require that a golf course be constructed. The usage provisions need to be in harmony. . Giving the Port an additional extension of time to negotiate will allow these fairness issues to be addressed. It is also important to keep in mind that the rationale for providing for an initial 5 year lease period to be succeeded by two 30 year renewal options was because of the mistaken belief that 5 years would provide ample time for Calpine /Oregon LNG to determine if it could obtain all of the requisite approvals for it to operate an LNG import facility . As it turned out , 5 years was insufficient . There was a mutual mistake about that issue and the way to redress it is to grant an additional extension of time to the Port .

Also I just recently learned that .there is an ongoing open investigation being conducted by the Oregon DOJ regarding potential wrongdoing in conjunction with the Port's negotiation and entry into the sublease with Calpine and additional time will allow DOJ to develop further information concerning that issue. For that reason , I am copying Mark Schumock on this message as well as Senator Betsy Johnson , whose district encompasses the Port . For all of the above reasons ,on behalf of the Port of Astoria , I respectfully request that it be allowed additional time to determine how best to proceed before being forced to make a rushed decision with huge financial implications and risks for all concerned..

Thank you for your consideration.

Sincerely yours , Thane Tienson

EXHIBIT D
PAGE 1 OF 1

10/13/2009