Thane W. Tienson, OSB No. 773741
ttienson@landye-bennett.com
Jennifer L. Gates, OSB No. 050578
jgates@landye-bennett.com
Landye Bennett Blumstein, LLP
1300 SW 5th Avenue, Suite 3500
Portland, Oregon 97201
Phone: (503) 224-4100
Fax: (503) 224-4133

*Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON AT PORTLAND

| | |
|---|---|
| LNG DEVELOPMENT COMPANY, LLC d/b/a OREGON LNG,<br><br>　　　　　　　　Plaintiff,<br><br>　v.<br><br>PORT OF ASTORIA, an Oregon Port; **DAN HESS**; an individual, **LARRY PFUND**; an individual, **WILLIAM HUNSINGER**, an individual, **JACK BLAND**, an individual, and **FLOYD HOLCOM**, an individual,<br><br>　　　　　　　　Defendants. | Case No. 3:09-CV-847 JE<br><br>**DECLARATION OF DANIEL HESS IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

**UNDER PENALTY OF PERJURY:**

**I, DAN HESS,** do hereby declare that the statements herein are made based on personal knowledge and I am competent to testify.

1.　I am both a current Commissioner for the Port of Astoria and a Commissioner who served on the Commission in November 2004 when the Upland Lease between the State of Oregon, Department of State Lands and Port of Astoria was signed, and when the Sublease between the Port and Skipanon Natural Gas LLC was signed.

Page 1 -　DECLARATION OF DANIEL HESS IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

2. I have reviewed the Declarations of former Executive Director Peter Gearin and former Commissioners Taggart, Bergeron, and McDaniel, all of whom were Port Commissions who also served in November 2004.

3. Mr. Gearin told us that more than 96 acres of the peninsula had been created around the turn of the century from dredge material and the Skipanon River had been then re-routed and those 96 acres of upland were created by filling in submerged lands. Consequently, he told us that the Oregon Division of State Lands claimed ownership, and the Port did not dispute that contention despite the fact that there had been some records and maps showing the Port having a potential ownership interest in the property, which had been identified by the Port at that time as a potential 18-hole golf course.

4. Mr. Gearin went on to say that he had been contacted by Calpine Corporation with regard to development of a natural gas import facility on the northern boundary of the Skipanon Peninsula, and that development would necessarily include acquisition of the Skipanon property from DSL by the Port, either through a long-term lease or a property purchase.

5. Mr. Gearin explained to us that Calpine corporation was a public company traded on the New York Stock Exchange that was a major independent power producer owning over 100 electric plants in North America and the U.K. employing thousands of people) to be the Sublessee. We were told that Skipanon Natural Gas LLC was a subsidiary of Calpine, and that it was interested in developing a liquified natural gas (LNG) import facility on the Skipanon River Peninsula in Warrenton across Youngs Bay from Astoria, Oregon.

6. Mr. Gearin explained that Calpine Corporation wanted to initially lease the property from the Port for a period of five years during which time it could cancel the Lease should they determine that the project was not feasible. If it was determined to be feasible, then it would like two 30-year renewal options.

7. The Port would also be obligated to agree to a five-year initial term. Mr. Gearin explained that there was an option to cancel the Lease after the first two years on the part of

Calpine, thus exposing the Port to a risk of payments for three years without any offset for the Calpine Sublease. Mr. Gearin stated that the entire permitting process for the LNG import facility was expected to take two to three years after which Calpine would proceed with construction and exercise its whole options if it obtained all of the necessary permits and decided to proceed with construction of the facility.

8. The initial five-year period and the two-year cancelation option were provided because we all assumed that in two to three years, Calpine would know whether it could get all of the approvals it needed to operate an LNG import facility and able to determine if the project was feasible or not.

9. We were provided with the Port Staff Report on November 3, 2004 by Mr. Gearin. The Staff Report stated that the permitting process was expected to take two to three years, after which time, if successful, Calpine would proceed with construction and would exercise its full options.

10. Mr. Gearin explained that while Port staff was not aware of any adverse environmental or safety concerns that would preclude the project from moving forward, a permitting process was necessary to determine such matters, and that the Lease would be structured so that Calpine would pay $38,400/year which would then be forwarded to the State as the Port's payment for its Lease, so that there was no direct financial benefit for the Port in the proposal. All of the Lease payments from Calpine would be passed through to the State, so there was no direct financial benefit to the Port from the Sublease.

11. Mr. Gearin also stated in the Staff Report that with respect to the golf course, there was nothing known to Calpine at the time that would preclude development of a golf course adjacent to the development, and that Calpine had agreed to work with the Port and provide whatever portion of the site that was not necessary for its project to the Port for a golf course, and that the Port could continue development of the golf course unless prohibited from doing so by regulatory agencies governing the natural gas import terminal.

Page 3 -  DECLARATION OF DANIEL HESS IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*538261.doc 13159-001*

12. To facilitate this development proposal from Calpine, Mr. Gearin asked us to authorize the signing of a Quitclaim Deed in favor of the State of Oregon, Division of State Lands, to quiet title to the 96 acres of Skipanon Peninsula property and to enter into a long-term Lease with the DSL for the 96 acres, and then to enter into the lease with Calpine's subsidiary, Skipanon Natural Gas LLC.

13. Mr. Gearin explained to us, both in our Executive Session and in the Staff Report, that that chief difference between the Lease between the Port and DSL and the Sublease is that in the Sublease, Calpine had an option to cancel the Lease after the first term, but that other terms in the Lease were "essentially the same."

14. Attached to this Declaration as Exhibits "A" and "B," respectively, are copies of the Commission Staff Report and a transcript of that portion of the Executive Session of that same date dealing with the Lease and Sublease.

15. I was not provided with copies of the Lease and Sublease, and to my knowledge, none of the other Commissioners were provided with copies either. None of the Commission members had been involved in any negotiations or meetings with Calpine to my knowledge. It was all done by Mr. Gearin, the Port's then-Executive Director. We relied upon his advice, and the Port's attorney, Heather Reynolds, for advice and trusted them.

16. Consequently, the Commission voted unanimously to sign the Quitclaim Deed and enter into the Upland Lease and Sublease.

17. In 2006, however, the Commission, of which I was still a member, learned that Calpine had filed a Petition for Bankruptcy in New York. We were all surprised by that development and concerned about the consequences to the Port, not only of the Sublease but of the Port's continuing obligations to make monthly payments to the State. The Port hired legal counsel to advise us, but the Port could not afford to send them back to New York to represent us in the bankruptcy proceeding.

//////

Page 4 -   DECLARATION OF DANIEL HESS IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

*538261.doc 13159-001*

18. The Bankruptcy Court assigned the Lease to another company of which we knew nothing. The Commission, to my knowledge, was never asked to nor did it ever vote on, whether to formally consent to the assignment to what is now Oregon LNG. That was something that the Bankruptcy Court decided on its own. The Commission was told by our attorneys that we had no way to protect or fight the assignment, but we did have our legal counsel send a letter to the Court expressing our concerns about the financial risk to the Port if the assignee did not make its Lease payments to us for the remainder of the initial five-year period. Through our legal counsel, we then succeeded in getting the parent company of the new assignee to sign a Guarantee promising that it would make the monthly payments to the Port for the first five-year period of the Lease, or until November 2009, and, in return for the Guarantee, the Port withdrew its objections to the assignment. A copy of the Guarantee is attached to this Declaration as Exhibit "C".

19. The permitting process is still continuing five years later, far longer than the two to three years we were told the process would require. We now understand from Oregon LNG that the permitting process could take another two years or more.

20. In the meantime, in 2007, our former Executive Director, Peter Gearin, was charged with a criminal violation of the Federal Clean Water Act, and the Commission later terminated his employment as Executive Director. A criminal investigation of the circumstances surrounding the Port's entry into the Sublease has been undertaken by the State of Oregon Department of Justice. Three of the five Commission members, Mr. Bergeron, Mr. McDaniel, and Mr. Taggart have also been replaced.

DATED this 13th day of October, 2009.

_____
DANIEL HESS

Page 5 -  DECLARATION OF DANIEL HESS IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

538261.doc.13159-001