

# Port of Astoria     Staff Report

**Date:**   November 3, 2004

**To:**   **Port of Astoria Commission**
**From:**   Peter Gearin

**RE:**   Skipanon Property Leases

**Background:**

The Port, in its strategic business plan, identified the Skipanon Peninsula as a golf course site.  Over the past three years, zoning has been changed from single user marine dependant to urban recreational.  Considerable discussions have ensued with investor groups over funding for the project.  A preliminary design has been developed which is currently under study in regards to wetland mitigation and the permitting process.

Ownership of the Skipanon Peninsula was gained through tax foreclosure ~~during the 1930's~~.  The northern 96 acres, however, were created around the turn of the century from dredge material when the Skipanon River was rerouted.  Since the 96 acres of upland was created by filling in submerged land, the Division of State Lands claims ownership.  The Port does not contest this claim, although some records and maps show the Port holding a potential ownership interest in the property.  Any port development for the area must therefore include acquisition of the property from DSL, either through a long term lease or property purchase.

Recently, the Port was contacted by the Calpine Corporation with regards to development of a natural gas import terminal on the northern boundary of the Skipanon Peninsula.  Essentially, natural gas in a liquid form would be transported on vessels from foreign sources to a dock from which the liquid would be pumped ashore into one of two storage tanks.  From there, the liquid would be converted to a gas and distributed via pipe line to the main distribution network located near Longview, Washington.

Calpine is a major independent power producer that owns and operates 102 gas fired and geothermal powered electric plants in North America and the U.K. employing 3,400 people.  Their stock is traded on the New York Stock Exchange.

Development of such a terminal requires significant investment in engineering and permitting with no guarantees that at the end of the process that the necessary approvals will be obtained.  The company therefore seeks to lease the property from the Port for five years during which they can cancel the lease should they deter

Commission Staff Report: Page 2

that the project is not feasible.  However, if it is feasible, then the company would like two 30-year renewal options.

The proposed project is estimated to cost $500 million and as such represents a significant increase to the county's total assessed value.  The facility is expected to provide 50-75 well paying permanent jobs.  The construction is expected to take two to three years and require 2 million man hours to complete.  The economic implications for the City of Warrenton and Clatsop County are substantial.

The permitting process is expected to take two to three years and it will include public comment and input at all levels of the process.  Public process is of paramount importance to the Port.  Calpine is equally committed and has developed a comprehensive public education and outreach program with input from the Port.

While Port staff is not aware of any adverse environmental or safety concerns that would preclude the project from moving forward, the Port is not qualified to comment on such issues and must rely on the permitting process to determine such matters.

The proposal before the commission is for authorization to execute a quit claim to clear clouds to title, then to enter into a lease between the Port and DSL.  The lease rate is $38,400 per year based upon a 10% return on the appraised value of the property.  The initial term is 5 years with two 30 year options.  The Port then enters into a lease with Calpine with the same term and lease rate except that Calpine has the option to cancel the lease after the first term. Other terms between DSL and the Port and between the Port and Calpine are essentially the same.

*first year with a one year penalty.*

In regards to the golf course, there is nothing known to Calpine at this time that would preclude development of the golf course adjacent to the development. Calpine has agreed to work with the Port and provide whatever portion of the site that is not necessary for their project, to the Port for the golf course. The Port expects to continue development of the golf course unless prohibited from doing so by regulatory agencies governing the natural gas import terminal.

**Commission Action Required:**

1. Authorization to quit claim the northern most 96 acres of the Skipanon Peninsula to the Oregon Division of State Lands to quiet title.
2. Authorization to enter into a long term lease with the Oregon Division of State Lands for the above mentioned 96 acres.
3. Authorization to enter into a long term lease with ~~Anacapa Land Company~~. — Skipanon Natural Gas, LLC

4. *Promissory Note*

**Advantages:**

EXHIBIT  A
PAGE  2  OF  38

Should the project proceed, the county will benefit from a significant increase in assessed value, increased jobs and a significant construction project. The importation of natural gas promises to provide a hedge against rising domestic natural gas prices

Commission Staff Report: Page 3

which in turn promotes use of more environmentally friendly natural gas for the production of electricity.

**Disadvantages:**

During the first term (5 years), the Port is obligated to pay the state $38,400 per year. Calpine pays the Port $38,400 per year but has the option to cancel the lease after the first two years. Thus, the Port is at risk for three years lease expense with the state without an offset from the Calpine sublease.  However, since the Port is proceeding with the golf course development that is an expense it would have to encounter in any event.  The permitting process is also expected to take 2-3 years after which Calpine would proceed with construction and wish to exercise its full options.

# HEATHER REYNOLDS
ATTORNEY AT LAW
P.O. Box 145 • 800 Exchange Street, Suite 330
Astoria, Oregon 97103
(503) 325-8449
FAX (503) 338-2969

November 9, 2004

E. Andrew Jordan
**JORDAN SCHRADER**
Attorneys at Law
P.O. Box 230669
Portland, Oregon 97281

Dear Andy:

Enclosed are the relevant documents in my file pertaining to tax lot 810 15D 1900:

1.  Map of 810 15 showing the lot in question.

2.  County tax jacket (the vesting deed in the County is usually the first entry and there is none).

3.  Deed 309/359 that deeds all property surrounding this lot (landward) and the entire peninsula to the Port from the County. Parcel 90 (tabbed) may include the lot in question. It is clear, however, from this deed however, that the County intended to sell all the land it owned in that area to the Port.

4.  A copy of a title report on the property north of this parcel, which was found to be vested in the Port.

5.  A 1980 AG opinion in which the State claims ownership to submerged land.

6.  Correspondence with DSL and the Port wherein DSL decided it actually owns the property north of this strip, which the above title report had vested in the Port.

7.  A deed from DSL to the Port.

I don't have the homestead patent for the Eberman DLC to send you, but it was filed after 1859, thus any submerged land included in it would be claimed by the State. I have seen a homestead map before and am trying to locate a copy for you.

It is clear to me that the County intended to sell this property to the Port in 1968 and that it should have been included in the County to Port deed if it is not. (The County and Port were going to develop an aluminum smelter on the site.) Further, I believe the State would claim superior rights to the property if it was submersed land in 1859. In 1969, the State deeded adjacent submerged land to the Port. It calls to the high tide line. The homestead calls to the meander line. I believe the high tide line would be landward of the meander line.

EXHIBIT A
PAGE 4 OF 38

Andy Jordan
November 9, 2004
Page 2

     I had suggested the Port simply request the County quitclaim deed the property to the Port as another public entity rather than go through a quiet title process, as I thought it would be quicker and take less staff time for both public entities.  I was wrong, as it has instead become a time consuming political issue.

     This is the information from my files.  I believe the Port may be providing additional information from DSL.  Please advise as to any questions.

Sincerely,

HEATHER REYNOLDS
Attorney at Law

HR:bn

Enclosures

cc:   Port of Astoria

EXHIBIT A
PAGE 5 OF 38

# HEATHER REYNOLDS
### ATTORNEY AT LAW
P.O. Box 145 • 800 Exchange Street, Suite 330
Astoria, Oregon 97103
(503) 325-8449
FAX (503) 338-2969

April 24, 2000


John Lilly, Assistant Director
Policy and Planning, **Division of State Lands**
775 Summer Street NE
Salem, Oregon 97301-1279

RE:   Skipanon Property, Warrenton, Oregon

Dear John:

    Thank you for your fax with the chain of title notes.  As we discussed, enclosed is a copy of the **recorded** Quitclaim Deeds from Warrenton Lumber to the State.  Also enclosed are excerpts of the 1926 and 1932 deeds vesting Clatsop County, the Port's predecessor in interest, in title.  Please note these deeds foreclose all the percentage interests of the heirs of DK Warren.  The heirs of DK Warren had significant land holdings, all in percentages, and lost significant land holdings in the depression through tax foreclosure. I believe some of the percentages of interests retained through the depression were eventually taken by Warrenton Lumber which could explain why Warrenton Lumber may have thought it had an ownership interest in the parcel in question.

    Further enclosed for your reference is an abstract of the relevant portion of the 1968 deed from the County to the Port and the entire 1916 Definition of Boundary Line agreement.  You will note on page 359 that the legal for the land going into the agreement includes a number of DLC's.  I have not researched back to determine if the DLC's impacting the parcel in question predated statehood, as several in this area do. The parcel in question is Tract 4 on page 365 of the agreement.  This described tract is what Ticor Title shows vested by title in the Port (leaving aside the issues of fill, avulsion and submersible lands), by virtue of the 1968 deed from the County.

    Please note this parcel is significantly smaller than the one you asked Pacific Title to research.  If you have further questions regarding title to this parcel, please advise.

Sincerely,



HEATHER REYNOLDS
Attorney at Law

HR:bn
Enclosures
cc:   Peter Gearin, Executive Director, **Port of Astoria**

EXHIBIT _A_
PAGE _6_ OF _38_

**HEATHER REYNOLDS**
ATTORNEY AT LAW
P.O. Box 145 • 800 Exchange Street, Suite 330
Astoria, Oregon 97103
(503) 325-8449
FAX (503) 338-2969

June 21, 2000

John E. Lilly, Assistant Director
Policy and Planning Section
**Oregon Division of State Lands**
775 Summer Street, NE
Salem, Oregon 97301-1279

Dear John:

In April, we spoke of the Port's plans to develop a golf course on the Skipanon Peninsula. I believe that either you or Paul Cleary also spoke with the Port's Executive Director, Peter Gearin, at that time. When we spoke, DSL believed it owned land north (riverward) of the 4.9 acres making up tax lot 81014-101, which is the only land County and title company records show in State ownership. On April 24th, I sent you the documents you requested. It was my understanding that you were going to review your ownership concerns with the Attorney General's Office and let me know what your agency decided with regard to ownership. I have not heard from you, and Peter Gearin indicates he also has had no communication from your agency on this matter.

We need to resolve this issue before we can go forward with the golf course development. We also need to determine what involvement in the golf course DSL will have as a result of the property it owns. Does it want to be involved in construction of the course or would it rather sell or lease that property to the Port, or does DSL have other plans? The Port would appreciate knowing DSL's intent on this matter as soon as possible so that it can proceed with plans for the golf course project.

Sincerely,

HEATHER REYNOLDS
Attorney at Law

HR:bn

cc:    Peter Gearin, *Port of Astoria*

EXHIBIT _A_
PAGE _1_ OF _38_

## HEATHER REYNOLDS
### ATTORNEY AT LAW

P.O. Box 145 · 800 Exchange Street, Suite 330
Astoria, Oregon 97103
(503) 325-8449
FAX (503) 338-2969

## MEMORANDUM

**TO:**          Peter Gearin, Port of Astoria

**FROM:**       Heather Reynolds

**DATE:**       March 14, 2000

**RE:**          Skipanon Peninsula Ownership

     You indicated there was some allegation of the Division of State Lands regarding ownership of property on the Skipanon Peninsula. DSL does own tax lot 101, beyond the platted land, at the confluence of the Skipanon and Columbia Rivers. DSL took title to that parcel by deed from Dant and Russell in 1982. (Deed attached) Lot 101 is the only parcel on the peninsula they took title to, and it appears to be submerged or submersible land. If it is, DSL would control it anyway. Most of the peninsula was deeded to the Port in 1968 from Clatsop County. (Copies of the pertinent portions of the vesting deeds are attached) Two parcels, tax lots 100 and 500, which abut the Skipanon, had a very confusing chain of title. For that reason I asked TICOR title to do the research on ownership. They find the property clearly vested in the Port. Their report is attached together with the vesting deed.

     If DSL thinks it owns more property, it may be mis-reading it's legal description for lot 101, or it may have been deeded property that was owned by the Port, not the grantor on the DSL deed. Most of the peninsula land was tax foreclosed by the county in 1927 (book 121 page 49) and 1928 (book 124 page 378). The next referenced deed of record is to the Port in 1968. Thus, any deed to the state after 1968 would almost certainly be void, because the grantor had no interest to pass.

# HEATHER REYNOLDS
### ATTORNEY AT LAW

P.O. Box 145 · 800 Exchange Street, Suite 330
Astoria, Oregon 97103
(503) 325-8449
FAX (503) 338-2969

## MEMORANDUM

**TO:**     Peter Gearin, Executive Director
Port of Astoria

**FROM:**     Heather Reynolds

**DATE:**     March 16, 2000

**RE:**     Skipanon Peninsula

You have asked for a legal determination as to who owns tax lot 8-10-14-300 at the end of the Skipanon peninsula.  Apparently the Division of State Lands (DSL) has claimed it has a fee ownership interest in the property.  Attached is a title report from TICOR title.  The property is vested in the Port of Astoria.  The Port came into title, by deed from the county, in 1968.  The county took title by tax foreclosure in the 30's, so no third party could have superior title to the county.  The first deed of record on the property using the current legal description was executed in 1916.  That survey combined the interests of the heirs of pioneer D.K. Warren, (founder of Warrenton) and the Hammond Lumber Company (apparent successor in title to the interest of pioneer A.H. Hammond) into one jointly owned tract.  I have not yet traced the various pieces of the tract back to their initial platting or patent.  (Donation Land Claim patents were filed with the federal patent office, and may not appear in Clatsop County records).

In 1982 Warrenton Lumber quit claimed any interest it may have had in the property to DSL, which is probably why DSL thinks it has an interest in the property.  However, Warrenton Lumber did not have any interest to convey, and the deed is of no effect.  (Warrenton Lumber was involved in some short term leases on portions of the property and may have executed the quit claim deed to clear those leases).

Thus, DSL has no interest by title in the property.  The relevant deeds regarding title to the property (or pertinent portions thereof) are attached for your reference.

DSL may also claim an interest in the property by statute.  Exception #5 on the title report outlines what those claims or interest could entail.  ORS 274.025 (preceded by ORS 274.420, adopted in 1917) provides that any land lying below the ordinary high water line at statehood (1859) which has not become vested in any other person, belongs to DSL.  Many of the calls in the legal description of the subject property are to donation land claim boundaries, and many donation land

EXHIBIT A
PAGE 9 OF 38

Page 2

claims in this area pre-dated statehood. If the subject property was not vested in someone else at statehood, or vested in someone subsequently by statutory method, then that portion of it below water in 1859 would normally be vested in the State of Oregon. However, there is a legal issue of tax lots being established in the Columbia River, subsequent to statehood but before adoption of the statute vesting title in the state, which is peculiar to Clatsop County. ORS 273.850 resolved that issue by vesting lands in Astoria by statute. Although Warrenton lands were not included, the legislative history and statutory process regarding the Astoria lands would be of significant importance to any court determining rights in the subject property.

Under ORS 274.905 et. seq., if new land is created by dredge spoils on submersible land and the riparian upland is held by a public body, then the public body has a right to purchase the property, and DSL must sell the property, in the manner specified by statute, for basically the appraised value of the riparian uplands. Exception 6 shows that deposit of dredge spoils commenced on this parcel in 1931, however ORS 274.905 affects only spoils deposited after May 28, 1963. It would be a question of fact as to whether DSL complied with the statutory requirements of ORS 274.925, and a legal issue as to the remedies available to the port for DSL's failure to comply with the law.

If new land is created by accretion of sediment from the river (rather than dumping of spoils) then that land vests in the owner of the upland to which the accretion is attached. *Bonnett v. DSL,* 151 OR App 143, 949 P2d 735, (1997). However, this principle applies to untitled land, and the land in this case is titled. There is no case law addressing accretion on titled land. Resolution of the legal principles of submersible land and accretion will require significant factual research, commencing with the condition of the property in 1859.

In summary, the port conclusively holds fee title to the property. However, DSL may claim some statutory right in the submersible lands on the property. There are numerous legal principles and factual determinations that could impact the question of statutory rights. To resolve the issue of whether DSL has any statutory right in the submersible lands will involve either a court proceeding, which is both time-consuming and expensive, or the cooperation of DSL.

TICOR TITLE INSURA

630 BOND ST. - P.O. BOX 780
ASTORIA, OREGON  97103
(503) 325-2144

March 16, 2000

HEATHER REYNOLDS
800 EXCHANGE ST #330
ASTORIA, OR  97103

STATUS OF RECORD TITLE
ORDER NO. 4-85686

We have searched our Tract Indices as to the following described real property:

SEE "LEGAL DESCRIPTION" ATTACHED HERETO AND BY REFERENCE MADE A PART HEREOF.

Dated as of March 6, 2000 at 8:00 a.m.

Vestee:

-----PORT OF ASTORIA,
a municipal corporation of Clatsop County, State of Oregon-----

Said property is subject to the following on record matter:

NOTE:  Tax Acct. No. 3004 81014 00300 ID# 70758 (currently non-assessable).

1.  Warrenton City liens, if any.

2.  The premises herein described are within and subject to the statutory powers, including the power of assessment of Warrenton Diking District No. 2.

3.  Rights of the public in and to that portion lying within streets, roads and highways.

4.  Rights of the public and governmental bodies in and to any portion of the premises herein described lying below high water mark of the Skipanon River, Skipanon Waterway, and Columbia River, including any ownership rights which may be claimed by the State of Oregon below the high water mark.

5.  Any adverse claim based upon the assertion that:

Said land or any part thereof is now or at any time has been below the ordinary high water mark of the Skipanon River, Skipanon Waterway, and Columbia River.

Some portion of said land has been created by artificial means or has accreted to such portion so created.

Some portion of said land has been brought within the boundaries

Ticor Title Insurance Company

EXHIBIT  A
PAGE  1  OF  38

TICOR TITLE INSURA

thereof by an avulsive movement of the Skipanon River, Skipanon Waterway, and Columbia River
or has been formed by an accretion to any such portion.

6. Such rights and easements for navigation and fishing as may exist over that portion of the property lying beneath the waters of Skipanon River, Skipanon Waterway, and Columbia River.

7. Easement, including the terms and provisions thereof,
From:       Hammond Lumber Company, et al
To:         City of Warrenton
Recorded:   September 13, 1919
Book:       99                    Page:  37
Records of CLATSOP County, Oregon.

8. Dredging and disposal rights granted to United States of America by instrument recorded March 23, 1931 in Book 129, page 628, Deed Records.

9. Easement, including the terms and provisions thereof,
From:       Clatsop County, a political subdivision of the State of Oregon
To:         United States of America
Recorded:   February 25, 1957
Book:       239                   Page:  181
Records of CLATSOP County, Oregon.

10. Effect, if any, of Quitclaim Deed from June Chipman to H. G. Palmberg, recorded May 21, 1974 in Book 395, page 963, Clatsop County Records.

11. Effect, if any, of Quitclaim Deed from Marion Shultz to H. G. Palmberg, recorded May 21, 1974 in Book 395, page 964, Clatsop County Records.

12. Effect, if any, of Quitclaim Deed from Paul Troch to H. G. Palmberg, recorded May 21, 1974 in Book 395, page 965, Clatsop County Records.

13. Effect, if any, of Quitclaim Deed from Clifford Warren to Fred Warren, recorded June 4, 1974 in Book 396, page 606, Clatsop County Records.

14. Effect, if any, of Quitclaim Deed from Warrenton Lumber Company, an Oregon corporation, to the State of Oregon, acting by and through its Division of State Lands, recorded July 8, 1982 in Book 580, page 661, Clatsop County Records.

15. Effect, if any, of Quitclaim Deed from Warrenton Lumber Company, an Oregon corporation, to State of Oregon, acting by and through its Division of State Lands, recorded July 8, 1982 in Book 580, page 671, Clatsop County Records.

16. Leases, if any.

This report is to be utilized for information only. Any use of this report as a basis for transferring, encumbering or foreclosing the real property described will require payment in an amount equivalent to applicable title insurance premium as required by the rating schedule on file with the Oregon Insurance Division.

The liability of TICOR TITLE INSURANCE COMPANY is limited to the addressee and

EXHIBIT  A
PAGE  12  OF  38

TICOR TITLE INSURA

shall not exceed the premium paid hereunder.

TICOR TITLE INSURANCE COMPANY

KAREN CAMPBELL
TITLE OFFICER

KC:mgg

EXHIBIT A
PAGE 13 OF 38



This map is made solely for the purpose
of assisting in locating sale premises and
the Company assumes no liability for
variations, if any, in dimensions and
location ascertained by actual survey.

TICOR TITLE INSURANCE COMPANY

N

CLATSOP CO
Section 14 T8N F
PIERHEAD LINE    1" = 400'

30-0

EXHIBIT A
PAGE 14 OF 38

Descriptions of Real Properties

30-4
30-2

OFFICE OF COUNTY ASSESSOR, CLATSOP COUNTY, OREGON

CODE NUMBER

ACCOUNT NUMBER

| 1900 | SECTION 15 | TOWNSHIP 8 N | RANGE 10W | W.M. | MAP NO. 15 810 | |
|---|---|---|---|---|---|---|
| 20 | LOT | BLOCK | | | | AERIAL PHOTO |
| TAX LOT NUMBER | NO. | NO. | ADDITION | | cir Warrenton | |

| LEGAL DESCRIPTION | DEED RECORD | | | ACRES REMAINING |
|---|---|---|---|---|
| INDENT EACH NEW COURSE TO THIS LINE | YEAR | VOLUME | PAGE | |

All that tract of land in the Eberman DLC
lying N of the N line of Portoria Add and S of
the Gov. meander line, wh is also the N boundary
line of the Eberman DLC.

(Written for t ax-lotting purposes only)

Less Tax Lot #20-1   Cnty Ltr 1-17-67
(810.15-20-1)

| | | | |
|---|---|---|---|
| Affidavit | '74 | 395 | 959-960 |
| Affidavit | '74 | 395 | 961-962 |
| QC | '74 | 395 | 963 |
| QC | '74 | 395 | 964 |
| QC | '74 | 395 | 965 |
| QC | '74 | 396 | 606 |

Clatsop County

STATE OF OREGON,  }
County of Clatsop. } ss.

воок **309** РАGE **359**

This indenture made this ...22nd... day of ....July.... ...... 19 60. between Clatsop County, State of Oregon, a political subdivision of the State of Oregon, acting by and through its Board of County Commissioners, sitting for the transaction of county business, the party of the first part, and...

...... ...... a Municipal Corporation of Clatsop County, State of Oregon......

the part ... of the second part:

WITNESSETH That, Whereas, the County of Clatsop, State of Oregon, acquired the real property hereinafter described by means of tax sale and has received a deed therefore, and,

Whereas, the Board of County Commissioners of Clatsop County, State of Oregon, sitting for the transaction of county business, by order duly made and entered on the ...13th... day of ...June...

19 ...... in pursuance of Oregon Revised Statutes Chapter 275, ......

declared it to be for the best interest of said county to sell the hereinafter described real property, and by said order fixed the terms and price for the sale thereof, and directed the said Sheriff of said county to publish notice and make sale of the said hereinafter described real property in accordance with the terms of said order, and,

Whereas, the said Sheriff, pursuant to the terms of said order, has published said notice of as required by law, and,

Whereas, in pursuance of said order of the said Board of County Commissioners of Clatsop County, sitting for the transaction of county business, and of the laws of the state of Oregon, and in consideration

of the sum of ...... ......$..... ($ .......) ...... ...... ...... Dollars,

lawful money of the United States of America, paid to the Sheriff of Clatsop County, the receipt whereof is hereby acknowledged, said consideration being not less than the minimum price fixed and determined by said Board of County Commissioners, in its said order duly made and entered as aforesaid, the said

Sheriff sold to ...... ...... ...... a Municipal Corporation of Clatsop County, State ......

of Oregon,

the following described real property situated in Clatsop County, State of Oregon, more particularly described as follows, to-wit:

All lands owned by Clatsop County, a political subdivision, lying within the following described property situated in Sections 10, 11, 13, 14, 15, 22 and 23, Township 8 North, Range 10 West, Willamette Meridian, Clatsop County, Oregon.

Beginning at the intersection of the United States government Pier Head Line as established along the South bank of the Columbia River and Young's Bay as it existed in October 1916 with the Westerly right of way line of U. S. Highway No. 101, as relocated; thence Southerly and Westerly along the Westerly and Southerly right of way line of U. S. Highway 101 as relocated to its point of intersection with the Northerly right of way line of the Spokane, Portland and Seattle Railroad Company in the plat of Meriwether Downs, Clatsop County, Oregon;

thence Westerly along the said Northerly right of way line of the Spokane, Portland and Seattle Railroad Company to its point of intersection with the West line of Block 26, Extension to East Warrenton, City of Warrenton, Clatsop County, Oregon, extended Southerly in a straight line;

EXHIBIT
PAGE 12 OF 38

thence North along the Extension aforesaid and along the East line of N. E. Jetty Avenue to its point of intersection with the South line of N. E. 5th Place said point being also the Southwest corner of Block 4, Portoria, City of Warrenton, Clatsop County, Oregon;

thence East to the Southwest corner of Lot 15, Block 4, Portoria aforesaid;

thence North along the West line of said Lot 15 and the West line of Lot 6, Block 4, Portoria and its Northerly Extension, to the South line of N. E. 6th Street;

thence East to the Southeast corner of Block 1, Portoria;

thence North along the East line of the tract conveyed to Dant & Russell, Inc., by deed recorded January 18, 1967, in Book 290, page 391, Deed Records, Clatsop County to the Northeast corner of said Dant & Russell, Inc., tract;

thence Northwesterly to the Northwest corner of said Dant & Russell, Inc., tract;

thence Northwesterly along the Easterly Pierhead line of the Skipanon Waterway to its point of intersection with the United States Government Pier Head line aforesaid;

thence Southerly and Easterly along said United States Government Pier Head Line to the point of beginning;

including, but not limited to, the following described tracts:

PARCEL No. 1:  Lots 1, 2 and 3, Block 2, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 2:  Lots 1 through 15, Block 3, PORTORIA, City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 3:  Lots 6 through 15, inclusive, Block 4, PORTORIA, in Clatsop County, Oregon EXCEPTING that tract conveyed to the City of Warrenton by deed recorded March 5, 1939, in Book 147, page 190, Deed Records.

PARCEL No. 4:  Lots 1 through 20, inclusive, Block 7, PORTORIA, in The City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 5:  Lots 1 through 20, Block 8, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 6:  Lots 1, 2 and 3, Block 9, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 7:  Lots 1 through 13, inclusive, Block 10, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 8:  All of Block 11, being Lots 1 through 20, inclusive, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 9:  Lots 1 through 20, inclusive, Block 12, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 10:  Lots 1 through 20, inclusive, Block 15, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 11:  Lots 1 through 20, inclusive, Block 16, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 12:  Lots 1 through 16, inclusive, Block 17, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

EXHIBIT
PAGE 17 OF 3

BOOK 309 PAGE 361

PARCEL No. 13:  Lots 1 and 2, Block 18, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 14:  Lots 1 through 18, inclusive, Block 19, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 15:  Lots 1 through 16, inclusive, Block 20, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 16:  Lots 1 through 20, inclusive, Block 21, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 17:  Lots 1 through 20, inclusive, Block 22, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 18:  Lots 1 through 20, Block 26, PORTORIA, of the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 19:  Lots 1 through 20, inclusive, Block 27, PORTORIA, City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 20:  Lots 1 through 16, inclusive, Block 28, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 21:  Lots 1 through 16, inclusive, Block 29, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 22:  Lots 1 through 6, inclusive, Block 30, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 23:  Lots 1 through 6, inclusive, Block 31, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 24:  Lots 1 through 16, inclusive, Block 32, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 25:  Lots 1 through 20, inclusive, Block 34, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 26:  Lots 1 through 20, inclusive, Block 35, PORTORIA, in the City of Warrenton, County of Clatsop, State of Oregon.

PARCEL No. 27:  Lots 17 through 24 inclusive, Block 1, MERIWETHER FOWR ADDITION TO ASTORIA in Clatsop County, Oregon, EXCEPTING that portion of said lots conveyed to the State of Oregon by and through its State Highway Commission by deed recorded January 16, 1931 in Book 256, page 40, Deed Records.

PARCEL No. 28:  Lots 1 through 24, inclusive, Block 2, MERIWETHER DOWNS ADDITION TO ASTORIA, in Clatsop, State of Oregon.

PARCEL No. 29:  Block 3, MERIWETHER FOUR ADDITION TO ASTORIA in County of Clatsop, State of Oregon EXCEPT that tract conveyed to the State of Oregon by and through its State Highway Commission by deed recorded January 16, 1931, in Book 256, page 40, Deed Records.

PARCEL No. 30:  Lots 1 through 35 inclusive, Block 4, MERIWETHER DOWNS ADDITION TO ASTORIA in Clatsop County.

PARCEL No. 31:  Lots 1 through 48 inclusive, Block 5, MERIWETHER DOWNS ADDITION to Astoria in the County of Clatsop, State of Oregon.

BOOK 309 PAGE 302

PARCEL No. 32: Lots 4 through 40 inclusive, Block 6, MERIWETHER DOWNS ADDITION TO ASTORIA in Clatsop County, Oregon, EXCEPTING THAT PORTION conveyed to the State of Oregon by and through its State Highway Commission by deed recorded January 16, 1951 in Book 258, page 40, Deed Records.

PARCEL No. 33: Lots 1 through 48, inclusive, Block 7, MERIWETHER DOWNS ADDITION TO ASTORIA, in County of Clatsop, State of Oregon; EXCEPTING that portion conveyed to the State of Oregon by and through its State Highway Commission by deed recorded January 16, 1951 in Book 258 page 40 Deed Records.

PARCEL No. 34: Lots 1 through 48 inclusive, Block 8, MERIWETHER DOWNS ADDITION TO ASTORIA in Clatsop County, Oregon.

PARCEL No. 35: Lots 1 through 47 inclusive, Block 9, MERIWETHER DOWNS ADDITION TO ASTORIA in Clatsop County, Oregon.

PARCEL No. 36: Lots 1 through 43, Block 10, MERIWETHER DOWNS ADDITION TO ASTORIA, in Clatsop County, Oregon.

PARCEL No. 37: Lots 1 through 49, inclusive, Block 11, MERIWETHER DOWNS ADDITION TO ASTORIA in Clatsop County, Oregon.

PARCEL No. 38: Lots 1 through 48, inclusive, Block 12, MERIWETHER DOWNS ADDITION TO ASTORIA, in Clatsop County, Oregon.

PARCEL No. 39: Lots 1 through 48, inclusive, Block 14, MERIWETHER DOWNS ADDITION TO ASTORIA, in the County of Clatsop, State of Oregon.

PARCEL No. 40: Lots 1 through 40, inclusive, Block 13, MERIWETHER DOWNS ADDITION TO ASTORIA, in Clatsop County, Oregon.

PARCEL No. 41: Lots 1 through 29, inclusive, Block 15, MERIWETHER DOWNS ADDITION TO ASTORIA, in Clatsop County, Oregon.

PARCEL NO. 42: Lots 1 through 25, inclusive and Lots 31 through 35, inclusive, Block 16, MERIWETHER DOWNS ADDITION TO ASTORIA, in Clatsop County, Oregon.

PARCEL NO. 43: Lots 1 through 37, inclusive and Lots 39 through 48, inclusive, Block 17, MERIWETHER DOWNS ADDITION TO ASTORIA, in the County of Clatsop, State of Oregon.

PARCEL NO. 44: Lots 1 through 48, inclusive, Block 18, MERIWETHER DOWNS ADDITION TO ASTORIA, in the County of Clatsop, State of Oregon.

PARCEL NO. 45: Lots 1 through 19, inclusive Block 19, MERIWETHER DOWNS ADDITION TO ASTORIA in Clatsop County, Oregon, EXCEPTING that portion conveyed to the State of Oregon by and through its State Highway Commission by deed recorded January 16, 1951 in Book 258, page 40, Deed Records.

PARCEL NO. 46: Lots 1 through 14 inclusive, Block 20, MERIWETHER DOWNS ADDITION TO ASTORIA in Clatsop County, Oregon, EXCEPTING that portion conveyed to the State of Oregon, by and through its State Highway Commission by deed recorded January 16, 1951 in Book 258, page 40, Deed Records.

PARCEL No. 47: Block 1, WARRENTON PARK, in the County of Clatsop, State of Oregon.

PARCEL No. 48: Lots 1 through 8, inclusive, Block 3, WARRENTON PARK, in the County of Clatsop, State of Oregon.

BOOK 309 PAGE 363

PARCEL NO. 49: Lots 1 and 5 through 16, inclusive, Block 4, WARRENTON PARK, in the County of Clatsop, State of Oregon.

PARCEL NO. 50: Lots 2, 3 and 4 Block 4, WARRENTON PARK in Clatsop County, Oregon.

PARCEL NO. 51: Lots 1 through 12, inclusive, Block 5, WARRENTON PARK in the County of Clatsop, State of Oregon.

PARCEL NO. 52: Lots 1 through 12, inclusive, Block 6, WARRENTON PARK, in the County of Clatsop, State of Oregon.

PARCEL NO. 53: Lots 1 through 16 inclusive, Block 7, WARRENTON PARK, in the County of Clatsop, State of Oregon.

PARCEL NO. 54: Lots 1 through 16, inclusive, Block 8, WARRENTON PARK, in the County of Clatsop, State of Oregon.

PARCEL NO. 55: Lots 1 through 4, inclusive, Block 9, WARRENTON PARK, in the County of Clatsop, State of Oregon.

PARCEL NO. 56: Lots 1, 2 and 3, Block 10, WARRENTON PARK, in the County of Clatsop, State of Oregon.

PARCEL NO. 57: Lots 1 through 8, inclusive, Block 11, WARRENTON PARK, in the County of Clatsop, State of Oregon.

PARCEL NO. 58: Lots 1 and 2, Block 12, WARRENTON PARK in the County of Clatsop, State of Oregon.

PARCEL NO. 59: Lots 3 through 16, inclusive, Block 12, WARRENTON PARK, in the County of Clatsop, State of Oregon.

PARCEL NO. 60: Lots 1 through 12, inclusive, Block 13, WARRENTON PARK, in the County of Clatsop, State of Oregon.

PARCEL NO. 61: lots 1 through 12, inclusive, Block 14, WARRENTON PARK, in the County of Clatsop, State of Oregon.

PARCEL NO. 62: Lots 1 through 16, inclusive, Block 15, WARRENTON PARK, in the County of Clatsop, State of Oregon.

PARCEL NO. 63: Lots 1 through 14, inclusive, Block 16, WARRENTON PARK in the County of Clatsop, State of Oregon.

PARCEL NO. 64: Lots 1 through 12 inclusive, Block 42, FIRST EXTENSION OF EAST WARRENTON, in Clatsop County, Oregon.

PARCEL NO. 65: Lots 1 through 16, inclusive, Block 43, FIRST EXTENSION OF EAST WARRENTON, in Clatsop County, Oregon.

PARCEL NO. 66: Lots 1 through 6 inclusive and Lots 8, 9,10, and 12 through 16, inclusive, Block 44, FIRST EXTENSION OF EAST WARRENTON in the County of Clatsop, State of Oregon.

PARCEL NO. 67: Lots 1 through 20, inclusive, Block 45, FIRST EXTENSION OF EAST WARRENTON, in Clatsop County, Oregon.

PARCEL NO. 68: Lots 1 through 14 inclusive and Lots 16 through 20, inclusive, Block 46, FIRST EXTENSION OF EAST WARRENTON in Clatsop County, Oregon.

PARCEL NO. 69: Lots 1 through 15, inclusive, and Lots 17 through 20, inclusive, Block 38, FIRST EXTENSION OF EAST WARRENTON in Clatsop County, Oregon.

EXHIBIT
PAGE 8C OF 21

BOOK 309 PAGE 564

PARCEL 70:  Lots 1 through 20, inclusive, Block 35, FIRST EXTENSION OF EAST WARRENTON in Clatsop County, Oregon.

PARCEL NO. 71:  Lots 1 through 11, inclusive, Block 40, FIRST EXTENSION OF EAST WARRENTON in Clatsop County, Oregon.

PARCEL NO. 72:  Lots 1 through 5, inclusive, Block 41, FIRST EXTENSION OF EAST WARRENTON in Clatsop County, Oregon.

PARCEL NO. 73:  Lots 1 through 18, inclusive, Block 28 FIRST EXTENSION OF EAST WARRENTON in Clatsop County, Oregon.

PARCEL NO. 74:  Lots 1 through 18, inclusive, Block 29, FIRST EXTENSION OF EAST WARRENTON, in Clatsop County, Oregon.

PARCEL NO. 75:  Lots 2 through 19, inclusive, Block 26, FIRST EXTENSION OF EAST WARRENTON in Clatsop County, Oregon.

PARCEL NO. 76:  Lots 1 through 8 inclusive, Block 27, FIRST EXTENSION TO EAST WARRENTON in Clatsop County, Oregon.

PARCEL NO. 77:  Lots 1 through 4 inclusive, Block 22, FIRST EXTENSION OF EAST WARRENTON in Clatsop County, Oregon.

PARCEL NO. 78:
PARCEL A:  Beginning at the Southeast corner of Lot 1, Block 10, WARRENTON PARK, in Section 22, Township 8 North, Range 10 West, of the Willamette Meridian, Clatsop County, Oregon;
thence Westerly along the Southerly boundary line of Lots 1, 2 and 3 in said block and along the Southerly boundary line of Lots 2 through 6 inclusive, Block 27, FIRST EXTENSION OF EAST WARRENTON, 500 feet to the Southwest corner of Lot 6 in said Block 27;
thence South along the Easterly boundary line of North East King Avenue 100 feet to the Northerly boundary line of Northeast Harbor Place;
thence Easterly along the Northerly boundary line of said Northeast Harbor Place to the Westerly boundary line of Northeast Lake Avenue;
thence North 100 feet to the point of beginning;
said tract being vacated Lots 4 through 7 inclusive in Block 10, WARRENTON PARK and vacated Lots 9 through 15 inclusive in Block 27, FIRST EXTENSION OF EAST WARRENTON.

PARCEL B:  Beginning at the intersection of the Southerly boundary line of Northeast Harbor Place with the Westerly boundary line of Northeast Lake Avenue said point being South 170 feet from the Southeast corner of Lot 1, Block 10, WARRENTON PARK in Section 22, Township 8 North, Range 10 West of the Willamette Meridian Clatsop County, Oregon;
thence Westerly along the Southerly boundary line of said Northeast Harbor Place a distance of 499.97 feet to the Easterly boundary line of Northeast King Avenue;
thence South along the Easterly boundary line of said Northeast King Avenue 69 feet to the Northerly boundary line of Railroad Avenue;
thence Southeasterly along the Northerly boundary line of said Railroad Avenue 505 feet more or less to the Westerly boundary line of said Northeast Lake Avenue;
thence North 132.18 feet to the point of beginning;
said tract being vacated Lots 1 through 4, inclusive, in Block 11, WARRENTON PARK and vacated Lots 1 through 6, inclusive in Block 21, FIRST EXTENSION OF EAST WARRENTON.

PARCEL C: Beginning at the Southeast corner of Lot 15, Block 11, WARRENTON PARK in Section 22, Township 8 North, Range 10 West of the Willamette Meridian, Clatsop County, Oregon;

thence North 100 feet to the Southeast corner of Lot 2 in said Block 11;

thence Westerly along the Southerly boundary line of Lots 3 through 6 of said Block 11, a distance of 200 feet to the Southwest corner of said Lot 6;

thence Southerly along the Easterly boundary line of Lot 16 in said Block 11, a distance of 100 feet to the Southeast corner thereof;

thence Easterly 200 feet to the point of beginning;

said tract being vacated Lots 11 through 16, inclusive, Block 11, WARRENTON PARK, in the County of Clatsop, State of Oregon.

PARCEL No. 79: Lots 9 and 10, Block 11, WARRENTON PARK in the City of Warrenton, County of Clatsop and State of Oregon.

PARCEL No. 80: Lots 15 and 16, Block 11, WARRENTON PARK, in the City of Warrenton, County of Clatsop and State of Oregon.

PARCEL No. 81: Beginning at the Southeast corner of Lot 1, Block 29, FIRST EXTENSION OF EAST WARRENTON, in Clatsop County, Oregon;

thence Westerly, along the Southerly boundary lines of Lots 1 and 2 in said Block 29, 100 feet to the Southwest corner of said Lot 2;

thence Southerly along the Easterly Boundary line of Lot 18 in said Block 29, a distance of 100 feet to the Southeast corner thereof, which is on the Northerly boundary line of Northeast First Street;

thence Easterly along the Northerly boundary line of said Northeast First Street 100 feet to a point on the Westerly boundary line of Northeast King Avenue;

thence Northerly along the Westerly boundary line of Northeast King Avenue, 100 feet to the point of beginning;

said tract being vacated Lots 19 and 20 in said Block 29.

PARCEL No. 82: Lot 16, Block 38, FIRST EXTENSION OF EAST WARRENTON, in Clatsop County, Oregon.

PARCEL No. 83: Lot 15, Block 46, FIRST EXTENSION OF EAST WARRENTON, in Clatsop County, Oregon.

PARCEL No. 84: Lot 7, Block 44, FIRST EXTENSION TO EAST WARRENTON, Clatsop County, Oregon.

PARCEL No. 85: Lot 11, Block 44, FIRST EXTENSION TO EAST WARRENTON, City of Warrenton, Clatsop County, Oregon.

PARCEL No. 86: Lots 1 through 16, inclusive, Block 1, MERIWETHER DOWNS, Clatsop County, Oregon, EXCEPTING that portion in the State Highway.

PARCEL No. 87: Lots 1 and 20, Block 26, FIRST EXTENSION OF EAST WARRENTON, in Clatsop County, Oregon.

PARCEL No. 88: Lot 30, Block 16, MERIWETHER DOWNS ADDITION TO ASTORIA, in the City of Warrenton, Clatsop, County, Oregon.

PARCEL No. 89: Lot 38, Block 17, MERIWETHER DOWNS ADDITION TO THE CITY OF ASTORIA, in the City of Warrenton, Clatsop County, Oregon.

PARCEL No. 90: Commencing at a point in the basing line 2627.0 feet from the initial point thereof

Book 309    Page 366

thence South 6° 15' East to an intersection with the Government meander line along the right bank of Skipanon Creek in the Southeast quarter of the Southeast quarter of Section 15, in Township 8 North, of Range 10 West of the Willamette Meridian, Clatsop County, Oregon;

thence North 16° 30' East following said meander line to a point in said line;

thence following said meander line along the boundary of the Donation Land Claim of Elisha A. Bateman and Mrs H. Bateman;

thence along the meander line of Lot 1 of Section 15;

thence along the meander line of the Donation Land Claim of George W. Coffenberry and Sarah F. Coffenberry, to a point which is South of a point in the Basing Line 4842.4 feet from the initial point thereof;

thence North to a point in the Basing Line 4842.4 feet from the initial point thereof;

thence North 15° 0' East 4358.2 feet, more or less, to an intersection with the United States Government pierhead line, as now established, along and in front of the South bank of the Columbia River;

thence Northwesterly along said pierhead line 1903.9 feet, more or less, to a point, which point is North 19° 0' East 4058.4 feet from the place of beginning, which point is also the Northeast corner of what is known as Skipanon Waterway;

thence South 19° 0' West 4058.4 feet to the place of beginning.

Said Basing Line being that line established and described in that agreement between Hammond Lumber Co., D. K. Warren et al., recorded November 21, 1916 in Book 90 page 358, Deed Records, Clatsop County, Oregon.

PARCEL NO. 91:  Commencing at a point in the Basing Line 4842.4 feet from the initial point thereof;

thence South to the United States Government meander line to Lot 1 of Section 22, in Township 8 North, of Range 10 West, Willamette Meridian, Clatsop County, Oregon;

thence South 65° 45' East along said meander line to an intersection with a line dividing the East half of the Donation Land Claim of George W. Coffenberry and wife from the West half of said claim to a point, which point is also the Southwest corner of a tract of tide land conveyed by the State of Oregon to S. D. Adair by State deed dated April 10, 1893, and recorded in the Deed Records of Clatsop County, Oregon, in Volume "H", page 728;

thence North along the West line of said tract 5.02 chains to the Southwest corner of a tract of water frontage conveyed by S. D. Adair and Mary P. Adair, his wife, to the Astoria Savings Bank, Trustee, by deed dated February 9, 1894, and recorded at page 399 of Book "31", Records of Deeds of Clatsop County, Oregon;

thence along the Southerly end of said tract to a point which is due South of a point in the Basing Line 5463.8 feet from the initial point thereof;

thence North to a point in the Basing Line 5463.8 feet from the initial point thereof;

thence North 14° 10' East 4543.2 feet more or less to the United States Government pierhead line as now established along and in front of, the South bank of the Columbia River;

thence North 79° 0' West along said pierhead line 565.8 feet to a point;

thence South 15° 0' West 4388.2 feet to the place of beginning.

PARCEL NO. 92:  Commencing at a point in the Basing Line 5463.8 feet from the initial point thereof;

thence due South to an intersection with the Southerly line of that certain tract conveyed by S. D. Adair and Mary P. Adair, his wife, to the Astoria Savings Bank, Trustee, dated February 9, 1894, and recorded at page 399, Book "31", Records of Deeds of Clatsop County

State of Oregon, Clatsop County
State of Oregon, County of Clatsop
Oregon and its and Oregon and its
Board of County Commissioners

Port of Astoria, a municipal
corporation of Clatsop County, State
of Oregon.

...gbsc the fdrp. st in C of C. S of O. for $75,000.00.

Sig and Ack: C of C. S of O

Ret: Port of Astoria
P. O. Box 569
Astoria, Oregon

EXHIBIT A
PAGE 24 OF 38

Order continued page 5 of 22

Parcel #20: Lots 1 thru 18, incl, Bl 28, Fictoria...

Parcel #21: Lots 1 thru 18, incl, Bl 29, Portoria...

Parcel #22: Lots 1 thru 6, incl, Bl 30, Portoria...

Parcel #23: Lots 1 thru 6, incl, Bl 31, Portoria...

Parcel #24: Lots 1 thru 16, incl, Bl 32 Portoria...

Parcel #25: Lots 1 thru 20, incl, Bl 34 Portoria...

Parcel #26: Lots 1 thru 20, incl, Bl 35, Portoria, in...

Parcel #27: Lots 1? thru 24 incl, Bl 1, MERIWETHER DOWN ADDITION TO ASTORIA... in 3C, O, EXCEPTING THAT portion of sd lots conveyed to the 2 Bl O by and thru its SHC by D recd 1-16-21 253/40 Drs...

Parcel #28: Lots 1 thru 24, incl, Bl 2, MERIWETHER DOWNS...

Parcel #29: Block 3, MERIWETHER DOWN ADDITION...EXCEPT that tt conveyed... to the State of O,_by and thru its SHC ...253/40 Drs...

EXHIBIT A
PAGE 25 OF 38



COLUMBIA          RIVER

SEE MAP 8 10 10

EXHIBIT A
PAGE 26 OF 38

30-04

SEE MAP 8 10 14

YOUNGS

AES M. BROWN
RNEY GENERAL



## DEPARTMENT OF JUSTICE

100 State Office Building
Salem, Oregon 97310
Telephone: (503) 378-4400

May 19, 1980

No. 7904

This opinion is issued in response to a question presented by William S. Cox, Director, Division of State Lands.

### QUESTION PRESENTED

Did Oregon Laws 1963, ch 376 grant to the City of Warrenton fee simple title to certain new lands created upon submerged lands in Clatsop County, at the confluence of the Skipanon and Columbia Rivers and bounding the western side of Youngs Bay?

### ANSWER GIVEN

No. Although there is an argument to the contrary, we conclude that the city did not acquire title to the submerged lands in question.

### DISCUSSION

The question presented is whether the State of Oregon has fee simple title to certain filled lands located riverward of the

natural low water line of Youngs Bay and the Columbia River in Clatsop County. Ownership of the lands in question is claimed by Dant and Russell, a private corporation.

In 1883, the State of Oregon conveyed a 106 acre submersible land parcel to Mr. D. K. Warren. This deed contained a metes and bounds description of the tideland that fronted on both the Columbia and Skipanon Rivers. The deed did not purport to convey any submerged lands, and the State of Oregon retained its ownership of all submerged land (those lands below ordinary low water) adjacent to the D. K. Warren tideland.

Upon Mr. Warren's death, his property holdings were transferred to a number of heirs. Between 1911 and 1916, these parties consolidated their interests into the Hammond Lumber Co. and purported to extend their riverward boundary to the pierhead line of the Columbia River. This was done without the knowledge or consent of the State of Oregon or any deed from it. The effect of the heirs' action was to include 23 acres of state-owned submerged land within the Warren heirs' deed description.

In 1918, the City of Warrenton commenced construction and development of the Skipanon waterway into a medium-draft port. This included channel straightening, deepening, placement of bulkheads, and construction of a turning basin. Dredge spoils from this work and succeeding channel maintenance were placed on both the privately owned tideland and the State-owned submerged



land near the channel entrance. Over many years, this action elevated portions of the disputed parcel and formed land above the reach of ordinary tides.

Between 1919 and 1928, the City of Warrenton acquired all fractional interests of the D. K. Warren Estate along the west bank of the Skipanon River entrance. In 1969, the city conveyed this parcel to Warrenton Lumber Co., the predecessor of Dant and Russell, for the sum of $250,000. Despite the fact that the city used the "extended" description to include a sizable amount of State-owned submerged lands, the city excepted from the deed description public rights to that portion of the premises below the natural low water line of Youngs Bay.

The question asked is whether the State of Oregon has title to the filled submerged lands.

The waters involved in this instance, the Skipanon River, Youngs Bay and the Columbia River, are all navigable waters of the state. As such, title to the submerged and submersible lands of the bay and rivers passed from the federal government to Oregon at statehood, and the state is, therefore, the owner of the underlying submerged and submersible lands except to the extent conveyed by the state to others. State Land Board v. Corvallis Sand and Gravel Co., 429 US 363, 370-371 (1977); United States v. Oregon, 295 US 1, 6, 14 (1935); United States v. Utah, 283 US 64, 75 (1931); Shively v. Bowlby, 152 US 1, 56

EXHIBIT _A_
PAGE _29_ OF _38_

(1894); <u>State v. McVey</u>, 168 Or 337, 345, 121 P2d 461, 123 P2d 181 (1942). The state is also the owner of any formations developing on such lands after statehood, whether by natural processes or by artificial means such as by dredge spoils. 78 Am Jur2d <u>Waters</u> secs 433, 436-437; <u>Annot</u>, 91 ALR 2d 857, 881-883.

In 1963, this principle was recognized by the Oregon legislature when it enacted Oregon Laws 1963, ch 376. Section 5(1) of that Act provided:

> "Whenever new lands have been created upon submersible or submerged lands owned by the state and the adjoining or opposite upland or riparian land on the same side of the thread of the stream is owned by a <u>public body, such public body shall be the owner of the new lands so created</u> and that public body <u>shall pay</u> to the State Land Board <u>the reasonable value of the submerged or submersible land prior to creation of such new land</u>, or shall pay to the State Land Board the reasonable value of the new land less the expense to that public body of creation of said new land, whichever sum shall be less. <u>Such payment shall be made when that public body sells, leases, trades or uses said new lands for revenue</u>." (Emphasis added.)

The Act defined new lands as those lands "which have been created upon submersible or submerged lands by artificial fill or deposit." The Act was both retrospective and prospective in effect as it applied to "new lands created before, on or after the effective date of this Act." Or Laws 1963, ch 376, sec 9(2). The statute made an automatic grant of such new lands to any "public body" which was an owner of any adjoining or opposite

4

EXHIBIT A
PAGE 30 OF 38

upland or riparian land.  33 Op Atty Gen 363, 364 (1966).[1]

The term "public body" was defined in Oregon Laws 1963, ch 376,

sec 1(5), to mean:

> ". . . the State of Oregon or any port organized
> under the laws of this state or any dock com-
> mission of any city of this state."  (Emphasis
> added.)

Payment for the grant to a public body was not required until the

public body sold, leased, traded, or otherwise used said new

lands for revenue.  Section 5(1).  33 Op Atty Gen 363, supra.

The provisions effecting an automatic grant of title and spe-

cifying the time of payment remained the same until passage of

Oregon Laws 1973, ch 203, sec 4.  See Oregon Laws 1965, ch 575, §

4 and Oregon Laws 1967, ch 82, § 1.  Thus, in 1969 when the City

of Warrenton conveyed the disputed parcel here to Dant and

Russell, the provisions quoted earlier making an automatic grant

of new lands to public bodies were in effect except that the

measure of value to be paid by a public body for new lands had

been changed to:

> ". . . an amount prescribed by the board to pay its
> costs incurred in carrying out its duties under ORS
> 274.905 to 274.940."  Or Laws 1967, ch 82, sec 1.

As stated, the law defined public body to include the state,

a port, "or any dock commission of any city of this state."

5

Oregon Laws 1963, sec 1(5).  Neither counties nor cities as such were included, only a dock commission of a city.  The legal issue, therefore, is whether the City of Warrenton acquired title to the filled submerged or submersible lands as a "public body."

According to information furnished to us, at the time this legislation was passed, there were no dock commissions in the State of Oregon other than the Dock Commission of the City of Portland.  That is also the fact today except that the Portland Dock Commission no longer exists, having merged with the Port of Portland.  The Portland Dock Commission was not a separate corporate entity.  It was simply a department of the city "created for the purpose, among others, of operating the public docks of that city."  See Walters v. Dock Commission, 126 Or 487, 509, 266 P2d 634 (1928).  It was first created by the charter of the city in 1903.  It exercised broad powers over the harbor front of the city, including the power to purchase or acquire by condemnation lands for public owned dock purposes.  Blythe & Co. v. City of Portland, 204 Or 153, 155, 282 P2d 363 (1955).

The City of Warrenton does not have a dock commission as such.  In 1919, by Ordinance No. 260, it created a "Department of Public Docks."  In 1922 the voters of the City of Warrenton adopted a charter for the City of Warrenton.  The charter created a general governing body of the city known as a "commission," consisting of three members elected at large.  See 1922 Charter,

ch II, sec 1, 2-3.  The commission succeeded to the powers of the Department of Public Docks.  See 1922 Charter, ch 10, §§ 18, 42. It had broad authority and power to prepare a comprehensive plan for the construction of the harbor front of the City of Warrenton and to provide for the needs of commerce and shipping.  For those purposes, the commission had power and authority to provide for harbor improvements, including the construction of docks, piers and bulkheads, to provide for publicly owned docks, to engage in dredging and filling, to condemn real property and to have exclusive charge and control over all the improvements so provided. This commission was still operating at the time of the enactment of Oregon Laws 1963, ch 376, and at the time of the sale of the property in question.  In effect, the commission had many of the powers of and operated like a port district.

Under these facts, the legal issue is whether the City of Warrenton governing body, its commission, constituted a "dock commission" of the city and, therefore, a public body within the meaning of that phrase in Oregon Laws 1963, ch 376, sec 1(5).

Two views are possible on this issue.  Under the first view, since the City of Warrenton did not have a city agency known as a dock commission but only a governing body for the entire city, its "commission" would not qualify as a "public body" within the meaning of Oregon Laws 1963, ch 376, sec 1(5).  The argument in support of this view is that the legislature advisedly chose limiting language ("dock commission of any city of this

EXHIBIT A
PAGE 33 OF 38

state") so as in general to exclude cities from the classifica-
tion of public body.  At the time the law was passed only the
City of Portland had an agency known as a dock commission.  Thus,
it can reasonably be argued that the legislature used the term
dock commission as a classification device to exclude any city
other than the City of Portland from the term "public body."

Legislative history lends support to this view.  Earlier ver-
sions of HB 1538, the bill which became chapter 376, contained a
much broader class of public bodies entitled to the statutory
grant.  The original version of HB 1538 provided in part as
follows:

> "Whenever tide or submerged lands owned by the
> state are filled so as to create new lands, and the
> owner of the adjoining riparian lands or uplands is
> the state or an agency thereof or a political sub-
> division or public corporation of this state, such
> owner shall be the owner of the new lands.
> Whenever tide or submerged lands owned by the state
> are filled so as to create new lands, and the owner
> of the adjoining riparian lands or uplands is any
> other person, such person is entitled to purchase
> the new lands from the State Land Board for the
> reasonable value thereof, less any amounts actually
> expended by the owner of the adjoining riparian
> lands or uplands in the creation of the new lands."
> (Emphasis added.)

Under this language, a cost free grant of new land was made
to any "political subdivision or public corporation of this
state."  This language was clearly broad enough to include the
counties and cities as well as ports.  Persons other than public

8

EXHIBIT A
PAGE 34 OF 38

bodies who adjoined, were opposite to or were riparian to such filled lands had the right to purchase such new lands "for the reasonable value thereof." Engrossed House Bill 1538 (April 12, 1963) essentially continued this scheme and defined "public body" as including "an agency, political subdivision or public corporation of the state," thus qualifying essentially all public entities for the statutory cost-free grant. See Engrossed HB 1538, secs 1(5), 5 and 6.

The State Land Board offered amendments to Engrossed House Bill 1538 which limited public bodies to the state, ports or any "dock commission of any city of this state" and required such public bodies to pay the State Land Board

"the reasonable value of the submerged or submersible land prior to creation of such new land, or shall pay to the State Land Board the reasonable value of the new land less the expense to that public body of creation of said new land, whichever sum shall be less." (See marked up bill attached to April 30, 1963 minutes of the Senate Local Government Committee.)

The board's amendments therefore narrowed the definition of public bodies entitled to the grant and required a limited amount of compensation from such bodies.

John C. Beatty objected on behalf of the Port of Portland to the requirement of compensation, stating in part:

EXHIBIT A
PAGE 35 OF 38

"Should the committee feel that it desires to restrict the compensation free transfer of new lands to public bodies, on the theory that some public bodies are not engaged in the promotion of commerce and industry, we have no objection to deleting public body and inserting Port District in section 5." (See Ex 1, April 30, 1963 minutes, Senate Local Government Committee.)

The result of the foregoing objections and proposed changes was that the final Senate Amendments to Printed Engrossed HB 1538 (May 10, 1963), quoted earlier in this opinion, drastically limited the definition of public body to include only the state, ports and a dock commission of any city of the state and also eliminated the cost-free grant by requiring limited payment from ports and city dock commissions.

The recorded legislative history thus makes clear that the legislature did not intend to make grants of lands created on submerged and submersible lands to cities and counties, but rather specifically limited the grant to the state, ports and dock commissions. As noted, when this Act was passed in 1963, the only "dock commission" in existence was the City of Portland Dock Commission. None existed elsewhere. To our knowledge, this continues to be true today except that the Portland Dock Commission was merged with the Port of Portland and no longer exists. It may reasonably be argued, therefore, that this new lands legislation, so far as cities are concerned, applied only to the City of Portland Dock Commission.

10

It may also be argued, however, that the concern of the legislature was only to exclude public bodies not engaged in the promotion of waterway commerce and industry, and that there was no intent to exclude other public bodies engaged in such commerce and industry simply because they did not have the name of "Dock Commission." Here, the argument goes, the City Commission of Warrenton was not only the governing body of the city, it also had authority to exercise essentially the same powers as the Portland Dock Commission for the purpose of developing the harbor of the City of Warrenton and for promoting its waterway commerce.

We do not find this argument persuasive. If adopted it could be applied to any city on the water with harbor or dock facilities with the result that cities by indirection under this interpretation would become public bodies under the law. Yet it is very evident from the changes made in HB 1538 as it progressed through the legislature, that the legislature intended to generally exclude cities and counties from the grant made by HB 1538. If it had intended otherwise, the original definition of public body would have been retained.

Moreover, we cannot ignore the almost peculiar phraseology the legislature chose in defining public body to include "a dock commission of any city of this state." In view of the fact that the only dock commission known as such at the time was that of

11

EXHIBIT $\frac{A}{}$

PAGE $\underline{37}$ OF $\underline{38}$

the City of Portland, it is evident to us that so far as cities were concerned, the legislature intended to benefit only the City of Portland by the statutory grant.  In legal effect, the legislature created a classification that only the City of Portland could meet, much like legislation in terms applicable only to cities over 300,000 in population.

Accordingly, it is our opinion that the City of Warrenton did not acquire title to the submerged lands in question under Oregon Laws 1963, ch 376 and that title to such lands is vested in the State of Oregon.

James M. Brown
Attorney General

JMB:PSH:bjh

---

1The testimony of John C. Beatty in the April 30, 1963 minutes of the Senate Local Government Committee, Ex I, stated:

"The bill transfers title without compensation to new lands from the state to another public body which owns the adjoining riparian upland land."

Under the bill as finally enacted payment for the land had to be made by the public body when the new lands were sold, leased or traded for revenue.  Section 5(1).

EXHIBIT A
PAGE 38 OF 38

```
 1                          Port of Astoria
 2                        Commission Meeting
 3                     Friday, November 5, 2004
 4
 5
 6   Speaker: Call the meeting to order. Port of Astoria Commission
 7   Meeting, Friday, November 5, 2004. Mr. McDaniels.
 8   McDaniels: Here.
 9   Speaker: Mr. Taggart.
10   Taggart: Here.
11   Speaker: Mr. Bercherod.
12   Bercherod: Here.
13   Speaker: Mr. Hess.
14   Hess: I'm here on the speaker.
15   Speaker: Atta boy. Mr. Fun is here, so all are present. Are there
16   any changes to the agenda?
17   Bercherod: Yes, we have a request for authorization to sell the
18   (inaudible) 6250 crane. Suggest that you put it down between Item
19   4 and Item 5.
20   Speaker: Okay. I trust that everybody's signed in. I'm going to
21   open up the floor for public comment. Well, let me read a
22   statement. We will now consider public comment and I would ask
23   anyone wishing to speak to please limit your remarks to three
24   minutes per person. I would remind anyone wishing to speak to
25   commence by stating your name and address and spelling your last
26   name for the record. The commissioners and staff are interested
27   in your comments, but cannot be engaged in dialogue at this time.
28   Citizens should not direct questions to commissioners or staff
29   during the public comment period. Additionally, I want to ask
30   that you limit your comments to matters within the (inaudible) of
31   the Port's Authority. The Port of Astoria is not in the business
32   of permitting or determining the feasibility of a development
33   project or in the business of promoting economic development by
```

EXHIBIT B
PAGE 1 OF 1

1

289  **Speaker:** All right, voted unanimous, the ayes carry. Item 5,
290  (inaudible) Calpine.
291  **Male:** Yes, the Port of Astoria strategic business plan identified
292  the Skipanon Peninsula as a golf course site. Over the past three
293  years (inaudible) has been changed from single user to
294  independent to urban recreational. Considerable discussions have
295  ensued with investor groups over funding for that project.
296  Preliminary designs have been developed, which is currently under
297  study in regards to wetland mitigation and the permitting process.
298  Ownership of the Skipanon Peninsula was gained through tax
299  foreclosure. The northern 96 acres, however, were created around
300  the turn of the century from drudge material and the Skipanon
301  River was rerouted. Since the 96 acres of upland was created by
302  filling in submerged lands, the Division of State Lands claims
303  ownership. The Port does not contest this claim, although some
304  records and maps show the Port holding a potential ownership
305  interest in the profit. Any Port development of the area must
306  therefore include acquisition of the property from DSL either
307  through a long-term lease or property purchase. Recently the Port
308  was contacted by Calpine Corporation with regard to development
309  of a natural gas import terminal on the northern boundary of the
310  Skipanon Peninsula. Essentially, natural gas in a liquid form
311  would be transported on vessels from foreign sources to a dock
312  from which the liquid would be pumped ashore into one of two
313  storage tanks. From there the liquid would be converted to a gas
314  and distributed by a pipeline to the main distribution network
315  near Longview, Washington. Calpine is a major independent power
316  producer that owns and operates 102 gas, fire, geothermal power
317  electric plants in North America and the UK employing 3400 people.
318  Their stock is traded on the New York Stock Exchange. Development
319  of such a terminal requires a significant investment in
320  engineering and permitting with no guarantee at the end of the

10

EXHIBIT B
PAGE 2 OF 7

321  process that the necessary approvals will be obtained. The
322  company, therefore, seeks to lease the property from the Port for
323  five years during which they can cancel the lease should they
324  determine that the project is not feasible; however, if it is
325  feasible then the company would like two 30-year renewable
326  options. The proposed project is estimated to cost $500 million
327  and as such represents a significant increase to the county's
328  total assessed value. The facility is expected to provide 50 to
329  75 well-paying, permanent jobs. Construction is expected to take
330  2 to 3 years and require 2 million man-hours to complete. The
331  economic implications for the City of Warrenton and Clatsop
332  County are substantial. The permitting process is expected to
333  take 2 to 3 years and it will include public comment and input at
334  all levels of the process. Public process is of paramount
335  importance to the Port. Calpine is equally committed and has
336  developed a comprehensive public education outreach program with
337  input from the Port. While Port staff is not aware of any adverse
338  environmental or safety concerns that would preclude the project
339  from moving forward, the Board is not qualified to comment on
340  such issues and must rely on a permitting process to determine
341  such matters. The proposal before the commission is for the
342  authorization to execute a quick-claim to clear clouds on the
343  title, then to enter into a lease between the Port and DSL. The
344  lease rate is $38,400 per year based upon a 10 percent return on
345  the face value of the property. The initial term is five years
346  with two 30-year extensions. The Port then enters into a lease
347  with Calpine with the same term and lease rate except that
348  Calpine has the option to cancel the lease after the first year
349  with a one year penalty. Other terms between DSL and the Port and
350  between the Port and Calpine are essentially the same. In regards
351  to the golf course, there is nothing known to Calpine at this
352  time that would preclude the development of the golf course

11

EXHIBIT _B_
PAGE _3_ OF _7_

353 adjacent to the development. Calpine has agreed to work with the
354 Port and provide whatever portion of the site is not necessary
355 for their project to the Port for the golf course. The Port
356 expects to continue development of the golf course unless
357 prohibited from doing so by regulatory agencies governing the
358 natural path for terminal. The commission action which is
359 requested is to one, authorize to quick-claim the northern most
360 96 acres of the Skipanon Peninsula to the Oregon Division of
361 State Lands (inaudible) title; two, to authorize to enter into a
362 long-term lease with the Oregon Division of State Lands for the
363 above-mentioned 96 acres; three, to authorize to enter into a
364 long-term lease with the Calpine subsidiary that they have
365 appointed, Skipanon Natural Gas LLC; and also finally under the
366 terms of the state lease, the Port must provide a letter of
367 credit to insure annual payment and the bank has required a
368 promissory note to secure that. We need authorization from the
369 commission on that as well. Advantages. Should the project
370 proceed, the county will benefit from the significant increase in
371 assessed value, increased jobs, and a significant construction
372 project. The importation of natural gas promises to provide
373 (inaudible) rising domestic gas prices, which in turn promotes
374 use of more environmentally friendly natural gas for the
375 production of electricity. The disadvantages are that during the
376 first five year term the Port is obligated to pay the State
377 $38,400 per year. Calpine pays the Port $38,400 per year, but has
378 the option to cancel the lease after the first two years. Thus,
379 the Port is at risk for three years' lease expense with the State
380 without an offset from the Calpine sublease. However, since the
381 Port is proceeding with the golf course development that is an
382 expense it would have to incur in any event. The permitting
383 process is also expected to take 2 to 3 years after which Calpine

EXHIBIT B
PAGE 4 OF 7

384   would proceed with construction and exercise its whole options if
385   it (inaudible).
386   **Speaker:** (Inaudible).
387   **Male:** In everything that we've done I've always said that the
388   public process was extremely important. I believe they
389   (inaudible) before it's (inaudible) and we should give people a
390   chance to state their views on it. And I think by doing what's
391   proposed tonight, I don't think we're taking away the public's
392   ability to participate in the process. This is strictly leasing
393   land. We know that when it goes through the permitting process
394   there are going to be many opportunities for the community to
395   participate, to express their concerns and maybe influence the
396   people who issue the permits. So, I don't think what might be
397   done tonight is anyway trying to short-cut the process and
398   deprive people of their ability to participate in the process.
399   **Speaker:** Thank you.
400   **Male:** I know the process that comes to my mind concerning this
401   issue. When we were first proposed with this there has been that
402   natural gas fire down in Texas and so, of course, you react the
403   same way. And this is a different situation and that's one of the
404   things that is, has basically soothed my concerns and that's that
405   we're dealing with extremely cold weather, minus 260 degrees. The
406   liquid doesn't burn, but in vapor form it can when it's a proper
407   mixture with air. By and large I don't have any problems. The
408   tankers are triple hold, the tanks themselves are surrounded by ¾
409   concrete; they're built to withstand an airplane strike. And
410   they're also surrounded by (inaudible) that recovers any spilled
411   gas. I really think this would be a truly safe operation. I may
412   find out different. It's going to have to go through processes to
413   prove that all these things are true. So my process is clear on
414   it. I think it's the right thing for us to do.
415   **Speaker:** (Inaudible).



EXHIBIT B
PAGE 5 OF 7

416 **Male:** He said it.

417 **Male:** And also, I think it's an opportunity also in speaking with

418 Calpine on many occasions, they do have a desire to hire local

419 people, whether it be for the construction phase, which is going

420 to be good for the local carpenters and construction. And they

421 want people who are committed to the area and committed to work,

422 to work the plant when the permanent jobs come online and it may

423 take some time for them to go off and be schooled. Calpine does

424 have schools to teach them how to run these plans. It looks real

425 clear to me that there would be local people getting very good

426 paying jobs and that is, to be honest with you, the reason I ran

427 for this position was to help create jobs and economic

428 development. So, that's all I've got.

429 **Speaker:** Do we have a motion? Dan, did you have anything?

430 **Dan:** No, I'm fine, thank you. No, I'm all for it. I think

431 (inaudible) a little bit, I got to talk to them (inaudible)

432 operations. I know about the one there in St. John's in Portland

433 and also the one in Newport. I remember what a fuss we had when

434 they put the one in Newport (inaudible). Oh my God, it's an

435 atomic bomb, oh my God, it's going to blow up, it's going to kill

436 everybody. And it's a great relief it runs into the other river

437 there it's going to be an iceberg, which is true. (Inaudible).

438 I'm all for it. I think this will give us a chance to get some

439 income and relief for the City of Warrenton and the County of

440 Clatsop. (Inaudible) to help with infrastructure (inaudible). I'm

441 all for it.

442 **Speaker:** Thank you, Dan.

443 **Male:** I'd just like to add that as a commissioner, I personally

444 am going to proceed cautiously and hear what both sides have to

445 say about the project. It's a new concept, at least to me and I

446 haven't heard enough about the project from either side to


EXHIBIT B
PAGE 6 OF 7

447  certainly influence any decision I'm going to make. At least on
448  my behalf, I'm going to proceed with caution.
449  **Speaker:** Do we have any motions?
450  **Male:** Move for a motion for approval of Regulation 2004-20,
451  approving the lease with Oregon Division of State Lands.
452  **Male:** Second.
453  **Speaker:** Motion to approve the lease with Oregon Division of
454  State Lands. Second. All in favor say aye.
455  **All:** Aye.
456  **Speaker:** Carried.
457  **Male:** Motion to 2004-21 approving quick-claim of 96 acres of
458  Skipanon to the State of Oregon Division of State Lands.
459  **Male:** Second.
460  **Speaker:** A motion and a second to approve the quick-claim of 96
461  acres on Skipanon Peninsula to the State of Oregon Division of
462  State Lands. All in favor say aye.
463  **All:** Aye.
464  **Speaker:** It's unanimous.
465  **Male:** I move for approval of Resolution 2004-22 to enter into a
466  long-term lease with Skipanon Natural Gas LLC.
467  **Male:** Second.
468  **Speaker:** Motion to approve resolution 2004-22 to enter into a
469  long-term lease with Skipanon Natural Gas LLC. All in favor say
470  aye.
471  **All:** Aye.
472  **Speaker:** It's unanimous. The ayes carry. Is there more?
473  **Male:** Yeah. Resolution 2004-23 approving promissory note with the
474  Bank of Astoria and approval of the (inaudible) agreement with
475  the Bank of Astoria.
476  **Male:** Motion to accept.
477  **Male:** Approve the promissory note with the Bank of Astoria. I
478  have a second. All in favor say aye.

EXHIBIT _B_

PAGE _1_ OF _7_

15

# GUARANTEE

This Guarantee (the "Guarantee") is entered into as of December 29, 2006, between the Port of Astoria, a Municipal corporation of the State of Oregon, (hereinafter referred to as "Port"), and Leucadia National Corporation, a corporation organized under the laws of the State of New York (hereinafter referred to as "Guarantor").

**WHEREAS**, Port subleased property on the Skipanon Peninsula in the City of Warrenton, Clatsop County, Oregon to Skipanon Natural Gas, LLC ("SNG") , pursuant to that certain Sublease Agreement, dated as of November 4, 2004 (the "Sublease Agreement"), and

**WHEREAS**, SNG filed bankruptcy on December 20, 2005 and has requested the Court order assignment of SNG's right, title and interest in and to the Sublease Agreement to LNG Development Company, LLC ("LNG"), and

**WHEREAS**, on December 18, 2006, SNG and LNG entered into that certain Contract for Assignment of Subleasehold Interest (the "Assignment Agreement"), and

**WHEREAS**, Guarantor is willing to guarantee certain of LNG's obligations under the Sublease Agreement to Port.

**THEREFORE**, for good and valuable consideration, it is AGREED as follows:

1.    Subject to provisions below, the Guarantor hereby irrevocably and unconditionally guarantees up to a maximum out-of-pocket expense of Guarantor of $500,000, as a primary obligor and not merely as a surety, (i) the punctual and complete payment of rent and taxes when due under Article 4 of the Sublease Agreement through November 4, 2009 and (ii) the filing of any amendments to the Master Development Plan as contemplated by Section 5.2 of the Sublease Agreement (each an "Obligation", and, collectively, the "Obligations"). This Guarantee is a guaranty of payment and not just of collectability and is in no way conditioned or contingent upon any attempt to collect from or enforce payment from LNG. The Guarantor agrees to hold the Port harmless from any failure of LNG to perform the Obligations as contemplated under the Sublease Agreement. This Guarantee shall only be effective upon the Closing Date (as defined in the Assignment Agreement) of the Assignment Agreement.

2.    If any Obligation shall not be paid or performed when due and after the expiration of or within any applicable grace or cure period, the Guarantor shall become liable to the Port for such Obligation, and the Guarantor will upon 14 days written notice from the Port forthwith pay or perform or cause to be paid or performed such Obligation, as the case may be. No provision hereof shall in any manner restrict the rights and remedies of the Port under the Sublease Agreement.

EXHIBIT _C_

PAGE _1_ OF _6_

3.    Except for notices required hereby, the Guarantor unconditionally waives, to the extent permitted by applicable laws, (a) notice that may be required, by statute, rule of law or otherwise, to preserve any rights of Port against Guarantor, (b) presentment to or demand of payment with respect to any amounts due under the Sublease Agreement, and (c) joinder of LNG in any suit, action or other proceeding to enforce this Guarantee.

4.    This Guarantee shall be effective on the Closing Date (as defined in the Assignment Agreement) of the Assignment Agreement and shall continue to be effective or be automatically reinstated, as the case may be, if at any time payment of any of the Obligations is rescinded or must otherwise be restored or returned, in whole or in part, upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of LNG or Guarantor, or upon or as a result of the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to LNG or Guarantor or any substantial part of its property, or otherwise, all as through such payment had not been made.

5.    Notwithstanding anything contained herein to the contrary, without limiting the Guarantor's own defenses and rights hereunder, Guarantor specifically reserves to itself all contractual defenses that LNG is or may be entitled to under, and subject to the terms and conditions of, the Sublease Agreement, except for any defenses arising out of bankruptcy, insolvency, dissolution or liquidation of LNG, a lack of power or authority of LNG to enter into the Sublease Agreement or to perform its obligations thereunder or the transactions contemplated thereby.  This Guarantee shall not be construed as imposing on the Guarantor any obligation to the extent excused or waived by Port in writing or discharged by the full and prompt payment by SNG.

6.    This Guarantee shall be binding upon Guarantor and inure to the benefit of Port and its successors and assigns.  Neither this Guarantee nor any of the rights, interests, or obligations hereunder shall be assigned or delegated by Guarantor without the prior written consent of the Port, which consent will not be unreasonably withheld.

7.    Whenever this Guarantee requires or permits any consent, approval, notice, request, or demand from one party to another, the consent, approval, notice, request, or demand must be in writing to be effective and shall be deemed to be delivered and received (a) if personally delivered, when actually received by the party to whom notice is sent, or (b) if delivered by telefax or facsimile, on the day transmitted, or (c) if delivered by mail (whether actually received or not), at the close of business on the third business day following the day when placed in the mail, postage prepaid, certified or registered, addressed to the appropriate party or parties, at the address and/or facsimile numbers of such party set forth below (or at such other address as such party may designate by written notice to all other parties.

To Port:        Port of Astoria
                422 Gateway
                Astoria, Oregon  97103

EXHIBIT _C_
PAGE _2_ OF _6_

Facsimile:  (503) 325-4525

To Guarantor:        Leucadia National Corporation
                     25 G Street
                     Salt Lake City, Utah  84103
                     Attention:  Justin Wheeler
                     Facsimile:  (801) 524-4944

With a copy to:      Snell & Wilmer L.L.P.
                     15 West South Temple
                     Suite 1200
                     Gateway Tower West
                     Salt Lake City, Utah  84101
                     Attention:  Michael D. Zimmerman, Esq.
                     Facsimile:  (801) 257-1800

8.     This Guarantee shall be governed by the laws of Oregon.  In the event of any action to enforce any of the terms of this Guarantee, the prevailing party shall be entitled to recover from the other parties such sum as the Court may adjudge reasonable as attorney's fees, at trial and on the appeal of such suit or action.

9.     GUARANTOR AND PORT EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTEE OR THE TRANSACTIONS CONTEMPLATED HEREBY.  THE GUARANTOR AND PORT EACH ACKNOWLEDGE THAT EACH OF THE OTHER PARTIES HAS BEEN INDUCED TO ENTER INTO THIS GUARANTEE BY, INTER ALIA, THE PROVISIONS OF THIS SECTION 9.

10.     This Guarantee is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

11.     This Guarantee may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.  Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

12.     Notwithstanding anything to the contrary herein, this Guarantee shall automatically terminate and be of no further force or effect upon the earlier to occur of (i) the termination of the Assignment Agreement or the Sublease Agreement or (ii) upon Abandonment (as defined in the Assignment Agreement) under the Assignment Agreement.

3

EXHIBIT  C
PAGE  3  OF  6

13.    Upon the execution of this Guarantee, the Port shall (a) immediately withdraw any objection to the assignment of the Sublease Agreement to LNG and (b) not object to or appeal any action or decision relating to the transfer of the Sublease Agreement to LNG as contemplated in the Assignment Agreement.

*[Remainder of Page Intentionally Left Blank]*

4

EXHIBIT C
PAGE 4 OF 6

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Guarantee to be effective as of the date first written above.

**PORT OF ASTORIA,**
a municipal corporation of the State of Oregon

By_____
President of the Port Commission

**LEUCADIA NATIONAL CORPORATION**

By_____
Name:
Title:

5

EXHIBIT __C__
PAGE __5__ OF __6__

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Guarantee to be effective as of the date first written above.

**PORT OF ASTORIA,**
a municipal corporation of the State of Oregon

By_____
President of the Port Commission

**LEUCADIA NATIONAL CORPORATION**

By_____
Name: Justin R. Wheeler
Title: Vice President

425266

EXHIBIT C
PAGE 6 OF 6