FILED'09 NOV 17 15:08USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| LNG DEVELOPMENT COMPANY, LLC, dba OREGON LNG, | ) ) ) | Civil No. 09-847-JE |
| Plaintiff, | ) ) ) | FINDINGS AND RECOMMENDATION |
| v. | ) ) | |
| PORT OF ASTORIA, an Oregon Port; DAN HESS, an individual; LARRY PFUND, an individual; WILLIAM HUNSINGER, an individual; JACK BLAND, an individual; and FLOYD HOLCOM, an individual, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

Gregory A. Chaimov
William D. Miner
Davis Wright Tremaine LLP
1300 S.W. 5th Avenue, Suite 2300
Portland, OR 97201

Attorneys for Plaintiff

FINDINGS AND RECOMMENDATION - 1

Thane W. Tienson
Jennifer L. Gates
Landye Bennett Blumstein, LLP
1300 S.W. 5th Avenue, Suite 3500
Portland, OR 97201

    Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff LNG Development Company, LLC (LNG), brings this action against defendants Port of Astoria (the Port) and Port Commissioners Dan Hess, Larry Pfund, William Hunsinger, Jack Bland, and Floyd Holcom (the Commissioners).  Plaintiff seeks declaratory, injunctive, and monetary relief based upon defendants' refusal to seek renewal of the Port's lease of certain real property from the Oregon Department of State Lands (DSL).

Plaintiff LNG moves for a partial summary judgment establishing that it has renewed a sublease between LNG and the Port for a thirty-year period, and that the Port has breached its obligation to LNG by failing to renew a Master Lease between the Port and the DSL.

Plaintiff's motion should be granted.

## BACKGROUND

Plaintiff LNG is a limited liability company organized under the laws of Delaware. Its principal place of business is in Vancouver, Washington, and it does business in Oregon as Oregon LNG.

Defendant the Port is an Oregon Port organized under the laws of Oregon.  It is located in Astoria, Oregon.  The Port is governed by a Board of Commissioners comprised of the individual defendants.

This action arises from the lease and sublease of approximately 94 acres of land (the premises) owned by the State of Oregon in Clatsop County, Oregon. On November 1, 2004, the State of Oregon, acting through the DSL, leased the premises to the Port through a document entitled "Upland Lease Agreement." (I will refer to that agreement as the "Master Lease Agreement" or as the "Master Lease" in this Findings and Recommendation.) Article 3.1 of the Master Lease provides for an initial lease period of five years, and Article 3.2 provides the Port with options to extend the lease for two additional thirty-year terms, if it is a tenant in good standing and "is not in material default of the lease" at the time of the renewal. Article 12.2 of the Master Lease Agreement provides that, with the State of Oregon's written consent, the Port may sublease, and extend or renew the sublease of the premises.

On November 5, 2004, the Port subleased the premises to Skipanon Natural Gas, LLC (Skipanon) through an agreement captioned "Sublease Agreement." Skipanon was a subsidiary of Calpine Corporation (Calpine). Acting through the DSL, the State of Oregon approved the sublease.

The Sublease Agreement includes terms very similar to the terms of the Master Lease Agreement. As with the Master Lease, Article 3.1 of the Sublease provides for an initial term of five years, and Article 3.2 provides that, as long as it is in good standing and is not in material default under the Sublease, the sublessee "shall have additional options to extend the sublease for **two (2)** additional terms of **thirty (30)** years each...." The Master Lease and the Sublease include identical rental rates and identical terms providing for periodic redetermination of the annual rent payable by the Port and the sublessee. The Sublease Agreement requires the sublessee to give the Port written notice that it is exercising the

option to extend the sublease period at least 180 days before the expiration of the current sublease period.

Calpine and Skipanon filed for bankruptcy protection in New York in 2006, and the Sublease was assigned to plaintiff LNG in bankruptcy proceedings on December 29, 2006. On that day, Leucadia National Corporation, which owns 80.1% of LNG, entered into an agreement with the Port guaranteeing timely payment of all taxes and rent due on the premises under the term of the Sublease Agreement through November 4, 2009, and the Port withdrew its objection to the Sublease assignment. In its Order authorizing assignment of the Sublease Agreement to plaintiff LNG, the bankruptcy court found that "no defaults (monetary or otherwise) exist under the Sublease, and . . . there are no monetary or non-monetary defaults under the Sublease that are required to be cured."

On April 24, 2009, plaintiff LNG gave timely notice to the Port that it was exercising its option to extend the sublease for an additional thirty-year term. The Port has not exercised its option to extend the Master Lease with the State of Oregon for an additional thirty-year term, and the original term of that lease expired on October 31, 2009. Instead, on August 18, 2009, the defendant Commissioners voted to extend the first term of the Master Lease for a two-year period, until October 31, 2011. On August 24, 2009, the Port and the DSL executed an amendment of the Master Lease extending the initial term of that lease until October 31, 2011. The Master Lease Amendment explicitly preserved the Port's option to renew the Master Lease for two additional thirty-year periods.

Defendants acknowledge that, on April 24, 2009, when plaintiff LNG exercised its option to extend the Sublease Agreement, "and thereafter, " LNG "was in good standing as required by the Lease." They assert, however, that, though they have made "reasonable

inquiry," they do not know whether plaintiff LNG was in "material default" of the lease "because the issue of whether or not the plaintiff was in material default cannot be determined with reasonable inquiry."

At a Port meeting conducted on January 20, 2009, Port Executive Director Jack Crider stated that plaintiff LNG had met its lease requirements, and that any issues concerning those requirements were "minor." The Port has never issued plaintiff LNG a notice of default, which is required under Article 13.2 of the Sublease Agreement before it may pursue any remedy under the terms of that agreement. The Port has not issued any notice of termination, or notice to cure any default under the Sublease Agreement. After plaintiff LNG exercised the option to extend the Sublease, the Port issued LNG an invoice for the rent, and cashed the rent check that LNG tendered.

Defendants assert that the initial lease period is now for a seven-year, rather than five-year period, and that the Port is not required to exercise its option to renew the Master lease for a thirty-year period at this time. Plaintiff contends that the agreement between the State and the Port to extend the Master Lease for a two-year period does not alter the Port's obligation to renew its Master Lease with the DSL for an additional thirty-year period, following plaintiff's exercise of the option to extend the Sublease Agreement.

Article 5.1 of the Master Lease and Article 5.1 of the Sublease Agreement specify "approved uses" for the premises. Article 5.1 in the Master Lease provides that the premises "shall be improved, used and maintained by [the Port] for the construction and development" of an 18-hole "Golf Course and Marine Industrial Facilities and for no other purpose." Article 5.1 of the Sublease Agreement specifies "construction and development of the Marine Industrial Facilities" as an "approved use," and does not mention a golf course.

Article 5.2 of the Master Lease and Article 5.2 of the Sublease Agreement provide that, within two years of the commencement of these agreements, the Port and the sublessee will develop and submit to the State of Oregon for its approval a Master Development Plan governing construction and development "of the Golf Course and Marine Industrial Facilities" on the premises.

With the express prior consent of the State of Oregon and the Port, the property was rezoned to I-2 (Heavy Industrial) and A-1 (Aquatic Development) in 2006.

Calpine and the Port submitted a Master Development Plan to the DSL in November, 2006. The Plan stated that, as a result of rezoning to allow the premises to be used "for marine-industrial purposes such as an LNG terminal," it would not be possible to construct an 18-hole golf course on the premises. The Plan did not provide for an 18-hole golf course, but showed a 9-hole golf course on land adjacent to the premises.

In a letter dated December 20, 2006, the DSL informed Ron Larsen, who was then the Port's Director of Operations, that DSL had reviewed the proposed Master Development Plan (MDP), and recognized that current zoning would "only allow certain Marine Industrial uses on the site and that a mixed-use development on the property will not be allowed." The letter further stated that the DSL had "granted preliminary approval of the MDP because of the conceptual nature of the proposed development area, the uncertainty of the actual construction plans, and additional uses contemplated by the MDP . . . ." It added that the DSL would expect the Port to finalize a Master Development Plan when land use approvals were obtained, and recognized that further development and engineering plans would be submitted pursuant to Article seven of the Master Lease.

Plaintiff LNG submitted another Master Development Plan in March, 2008. This Plan also indicated that a nine-hole golf course could be constructed on land adjacent to the premises. Nothing in the record indicates that the Port objected to or criticized that Plan.

### PLAINTIFF'S CLAIMS

Plaintiff LNG brings five claims. The first claim, asserted only against the Port, alleges that the Port has breached the Sublease Agreement by failing to timely exercise its option to renew the Master Lease, and by taking the position that it is not required to renew that lease after plaintiff LNG has exercised its option to renew the Sublease. This claim alleges that the Port "has no objectively reasonable basis for refusing to renew" the Master Lease, and requests a "decree of specific performance requiring the Port to exercise its option to renew under the Master Lease in order for the Port to meet its obligations under the Sublease and the intent of the parties."

The second claim, also brought only against the Port, alleges that the Port has breached an implied covenant of good faith and fair dealing by refusing to renew the Master Lease. Plaintiff LNG seeks recovery of monetary damages and attorney fees on this claim.

The third claim, which is also brought only against the Port, reiterates the allegations of the first claim, and alleges the right to recover monetary damages and attorney fees.

The fourth claim, which is brought only against the Port, reiterates the preceding allegations, and asserts that plaintiff LNG "is entitled to a declaratory judgment that the Port is obligated under the Sublease to exercise its option to renew the Master Lease."

The fifth claim is brought against all defendants. This claim reiterates the allegations set out in the preceding claims, and asserts entitlement to a declaratory judgment requiring

the individual defendants to "vote for the Port to exercise its option to renew the Master
Lease with DSL."

## STANDARDS FOR EVALUATING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 (c) authorizes summary judgment if no genuine
issue exists regarding any material fact and the moving party is entitled to judgment as a
matter of law. The moving party must show the absence of an issue of material fact. Celotex
Corp. v. Catrett, 477 U.S. 317, 325 (1986). The moving party may discharge this burden by
showing that there is an absence of evidence to support the nonmoving party's case. Id.
When the moving party shows the absence of an issue of material fact, the nonmoving party
must go beyond the pleadings and show that there is a genuine issue for trial. Id. at 324.

The substantive law governing a claim or defense determines whether a fact is
material. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th
Cir. 1987). Reasonable doubts concerning the existence of a factual issue should be resolved
against the moving party. Id. at 630-31. The evidence of the nonmoving party is to be
believed, and all justifiable inferences are to be drawn in the nonmoving party's favor.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1985). No genuine issue for trial exists,
however, where the record as a whole could not lead the trier of fact to find for the
nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587
(1986).

## DISCUSSION

As noted above, plaintiff seeks a partial summary judgment establishing that: 1) it has renewed its Sublease Agreement with the Port for a period of thirty years; and 2) the Port is in breach of its obligation under the Sublease Agreement because it has failed to renew the Master Lease with the DSL for a thirty-year period.

In determining whether plaintiff's motion for partial summary judgment should be granted, the court must begin by examining the "text and context" of the Sublease Agreement. See, e.g., M & W Zander v. Scott Co. of California, 190 Or. App. 268, 272, 78 P.3d 118 (2003) (in interpreting contract, court begins with "text and context" of agreement; extrinsic evidence is relevant only if these do not resolve all ambiguities). That agreement sets out the sublessee's right to renew the Sublease Agreement in clear, express, and unambiguous terms which, in the context of the relationship between the Master Lease and Sublease Agreement, leave no doubt as to the parties' rights and obligations.

Article 3.2 of the Sublease Agreement explicitly provides that, following the initial five-year sublease period,

> The Tenant shall have additional options to extend the Sublease for **two (2)** additional terms of **thirty (30)** years each, provided that at the time the option is exercised, Tenant is a tenant in good standing and is not in material default under this Sublease. Each option shall be exercised by Tenant by providing written notice to Landlord not less than 180 days prior to the expiration of the then current Term of this Sublease. [Emphasis in original.]

Under this article, plaintiff LNG's right to renew the sublease for an additional thirty-year term is conditioned <u>only</u> on its status as a tenant in good standing, the absence of a material default, and provision of the required 180 days of notice before expiration of the previous lease period. Article 3.2 does not condition the sublessee's right to renew on any

other factors. Instead, it unequivocally provides that LNG **shall** have options to renew the Sublease for additional thirty-year periods. Article 3.2 [emphasis added]. The Sublease Agreement does not state, imply, or suggest that LNG's right to renew the Sublease is in any manner or to any degree subject to the Port's discretion, to terms and conditions that were not included in the original Sublease Agreement, or to any decision the Port might later make to renegotiate the terms of its Master Lease with the Sate of Oregon. Under the express terms of the Sublease Agreement, so long as LNG meets the specified conditions for renewal, it is entitled to renew the Sublease for additional thirty-year periods.

Because plaintiff LNG has an absolute right to renew the Sublease if it meets the specified conditions, the Port is contractually committed to take the steps necessary to make the premises available for renewed thirty-year periods if LNG is in good standing, is not in material breach of the Sublease Agreement, and provides the required notice. If plaintiff LNG's renewal of the Sublease did not absolutely require the Port to take steps to renew the Master Lease for the same period, its option to renew, which goes to the core of the Sublease Agreement, could be worthless, or worse than worthless if LNG invested substantial sums in constructing a facility only to have its renewal denied. The plain terms of the Sublease Agreement would not permit the conclusion that LNG and the Port intended such a possibility when they negotiated the Sublease Agreement.

The court can determine whether the Port is obligated to take the steps necessary to renew the Master Lease if plaintiff LNG satisfies the requirements for renewal under the Sublease  Agreement by simply reviewing the Sublease Agreement. See, e.g., id. Nevertheless, I note that the context of the relationship between the Master Lease and the Sublease Agreement, and the understanding of those who originally negotiated, authorized,

FINDINGS AND RECOMMENDATION - 10

and executed these agreements, also support only the conclusion that plaintiff LNG has an absolute right to renew the Sublease Agreement, and that its exercise of the option to renew for a thirty-year period triggered the Port's obligation to seek renewal of the Master Lease. The Master Lease and the Sublease Agreement were executed only a few days apart, and are strikingly similar. Similarly numbered articles address similar issues, and the initial lease period, renewal periods, amount of the rent payable, and method of periodic adjustment of the rental rate, are identical. These similarities support only the conclusion that the Master Lease and the Sublease Agreement are intended to function in tandem, with the sublessee's renewal of a sublease period triggering the Port's absolute obligation to seek a similar renewal of the Master Lease so that the Port has the property available for sublease. This is the only way that the two leases can logically co-exist, and any other conclusion would be legally and practically untenable.

This is how those who negotiated, authorized, and executed the Master Lease and Sublease Agreement understood they would function: Three of the five Port Commissioners who participated in the unanimous decision to enter into the Master Lease and Sublease Agreement have submitted declarations stating their understanding that, if a sublessee extended the Sublease with the Port, the Port would similarly exercise its option to extend the Master Lease with DSL. Ron Larsen, who negotiated the Master Lease on behalf of the Port; Peter Hansen, plaintiff's CEO, who was involved in negotiation of the Sublease Agreement; and Peter Gearin, Executive Director of the Port when the leases were negotiated; have all submitted declarations stating that they had understood that, if a sublessee exercised the option to renew the sublease, the Port in turn would extend the Master Lease as well.

FINDINGS AND RECOMMENDATION - 11

No declarations or affidavits before the court express a contrary understanding of the effect of a sublessee's exercise of its option to renew the Sublease Agreement. However, based upon the terms of the Master Lease and the Sublease Agreement, even in the absence of these declarations, I would conclude that a sublessee's proper renewal of the Sublease requires the Port to take the steps necessary to renew the Master Lease. I simply note here that the declarations are fully consistent with my understanding of the relationship of the Master Lease and Sublease Agreement, and the Port's obligations under the Sublease Agreement.

I will now turn to the questions whether plaintiff has properly renewed the Sublease Agreement for a period of thirty years, and whether the Port has breached its obligation by failing to seek renewal of the Master Lease for a thirty-year period.

A. Has plaintiff LNG properly renewed the Sublease Agreement for an additional thirty-year period?

As noted above, the Sublease Agreement provides that the sublessee shall have additional options to extend the Sublease for two additional thirty-year periods if it is in good standing, is not in material default under the Sublease, and provides the Port with written notice of the extension at least 180 days before the then current term of the sublease expires.

The record before the court establishes, and defendants do not dispute, that LNG satisfied the first and last of these requirements. In a letter dated April 24, 2009, plaintiff LNG provided the Port notice that it wished to renew the Sublease Agreement for an additional thirty-year term, and defendants acknowledge both that LNG gave timely notice, and that it was "in good standing" both when it gave notice "and thereafter."

The record likewise supports the conclusion that plaintiff LNG is not in "material breach" of any provision of the Sublease Agreement. There is no evidence that plaintiff LNG has failed to perform any of the material acts required under the Sublease Agreement, or that the Port has ever informed LNG that the Port considers it to be in material breach of the Sublease Agreement in any respect. Nor has the Port otherwise acted as if LNG is in "material default" of the Sublease Agreement: After LNG gave notice that it wished to extend the Sublease Agreement for an additional thirty-year term, the Port issued LNG an invoice for the annual rent and accepted and cashed LNG's check for the amount of the rent without asserting, suggesting or implying that LNG was in material default of the Sublease Agreement.

The Port nevertheless contends that material issues of fact exist as to whether plaintiff LNG is in material default under the Sublease. It contends that LNG "may" be in material breach of the Sublease Agreement because Skipanon, the assignor of that agreement, failed to obtain approval of a Master Development Plan that includes an 18-hole golf course on the premises, and obtained a zoning change that allows for construction and operation of a natural gas importation facility, but precludes construction and operation of a golf course on the premises. The Port asserts that the failure to submit a Master Development Plan that includes a golf course "could" constitute a material breach of the Sublease Agreement because the Master Lease requires that the Plan include an 18-hole golf course on the premises, and Article 5.2 of the Master Lease provides that failure to comply with the terms and conditions of the Master Development Plan will be a material beach of the lease.

This contention fails for several reasons. As plaintiff LNG correctly notes, the Sublease Agreement neither includes "golf course" as a defined term, nor lists a golf course

as an approved use in Article 5.1. The definition of a golf course, and specification of development of an 18-hole golf course as an "approved use" appears in the Master Lease, to which plaintiff LNG is not a party. Article 5.1 of the Sublease Agreement provides that the premises shall be "improved, used and maintained" by the sublessee "for the construction and development of the Marine Industrial Facilities." Article 5.2 provides that the Port and the sublessee will develop and submit for the State's approval a Master Development Plan that will govern those parties' "construction and development of the Golf Course and Marine Industrial Facilities on the Land." This Article further provides that this plan "will provide for the best use of the Land and ensure that sufficient land is available to the Marine Industrial Facilities to allow it to meet all its permit requirements."

These provisions support the conclusion that construction of a golf course was not a material requirement under the Sublease Agreement. The Port's conduct throughout the course of its relationship with Skipanon and plaintiff LNG indicates that this has been the Port's understanding as well. As noted above, both the Port and the DSL gave prior express approval to Skipanon's application for a zoning change that precludes construction of an 18-hole golf course on the premises. The Port did not object to submission of a Master Development Plan in November, 2006, that envisioned construction of a 9-hole golf course on land adjacent to the premises, and the State gave preliminary approval to that plan, which explicitly stated that the premises had been rezoned in a manner that would not allow construction of an 18-hole golf course. The Port did not criticize or object to a more detailed Master Development Plan that plaintiff LNG submitted in March, 2008, which likewise did not envision construction of a golf course on the premises.

FINDINGS AND RECOMMENDATION - 14

This record will not support the conclusion that plaintiff LNG's failure to provide for construction of a golf course on the premises constituted a breach of the Sublease Agreement. However, even if that Agreement required LNG to include plans for a golf course on the property, by agreeing to a zoning change that precluded construction of the golf course, failing to object to the original or any revised Master Development Plan that did not provide for a golf course on the premises, and failing to issue Oregon LNG any Notice of Default, Notice of Termination, or Notice of Cure, the Port has waived any alleged breach with regard to a golf course. Significantly, under Article 5.2 of the Sublease Agreement, the sublessee and the Port are jointly responsible for developing and submitting a Master Development Plan. Therefore, if LNG or its predecessor in interest breached the Sublease Agreement by failing to provide for construction of a golf course in the Master Development Plan, it was a breach in which the Port participated, and of which it cannot now complain.

The record before the court supports only the conclusion that plaintiff LNG has satisfied the requirements for extension of the Sublease Agreement for a thirty-year period.


B. Has the Port breached the Sublease Agreement by failing to renew the Master Lease with the DSL?

The Port asserts that it is under no obligation to seek a thirty-year extension of the Master Lease at this time because the Master Lease has been extended for a two-year period. It further argues that there is no obligation to extend the Sublease Agreement at this time because "the initial five-year Lease periods contained in the Lease and Sublease essentially were based upon a mutual mistake of fact" as to the time needed to secure the permits required for construction and operation of a natural gas importation facility, and because it is not certain that LNG will make rent payments for thirty years if the lease is extended and

LNG fails to obtain the necessary permits for the facility. The Port also contends that

extension is not required now because of a "criminal investigation by the Oregon

Department of Justice concerning the circumstances under which former Port of Astoria

Executive Director Peter Gearin entered into the Lease and Sublease which are the subject of

this lawsuit." It asserts that it would be "irresponsible to exercise a 30-year option on the

leased parcel without knowing if there was criminal or fraudulent misconduct involved with

the leases' negotiation and execution." The Port argues that its agreement with the DSL to

extend the Master Lease for an additional two-year period negates any right or ability that

LNG otherwise had to effect a renewal of the Sublease for a thirty-year period, asserting that

the Master Lease is an "independent contractual agreement between the Port and DSL" which

does not allow a subtenant like LNG to "compel the Port as Landlord to simultaneously

exercise its 30-year renewal option in order to benefit a Subtenant." Finally, the Port

contends that extension of the lease is not required now because the State's consent is

required for renewal of the Sublease Agreement.


### 1. Effect of two-year extension of the Master Lease

The Port correctly notes that it has extended its Master Lease with the State of Oregon

for a two-year period. However, its assertion that this extension altered its obligations under

the Sublease Agreement is not persuasive, because plaintiff LNG was not a party to any

revision of the Master Lease, and amendment of the Master Lease did not amend the terms of

the Sublease Agreement. The Sublease Agreement clearly and unambiguously provides that

the sublessee **shall** have additional options to extend the Sublease for thirty-year periods.

Nothing in the Sublease Agreement states or implies that the Port can extinguish or diminish

a sublessee's right to extend the Sublease for thirty-year periods by negotiating a change in the Master Lease. Under the plain terms of the Sublease Agreement, the Port is committed to extend the Sublease Agreement if the sublessee so chooses. This obligation also requires the Port to take the necessary steps to exercise its own option to extend the Master Lease. The Port's negotiation of a modification of the Master Lease with the State cannot modify the terms of its agreement with a sublessee without the sublessee's acquiescence. LNG's rights arise pursuant to the terms of the Sublease Agreement, and defendants cannot reduce those rights by negotiating alterations of an agreement to which LNG is not a party. Because plaintiff LNG was in compliance with the terms of the Sublease Agreement, the timely exercise of its option to renew for an additional thirty-year period triggered the Port's obligation to take the steps required to renew its Master Lease with the State of Oregon.

## 2. Effect of requirement that State of Oregon approve extensions of sublease

Article 12.2(b) of the Master Lease provides that, with the State's prior written consent, the Port may extend or renew a sublease of the premises. Apparently based upon this provision, defendants assert that plaintiff LNG has identified "no act of the Port . . . that has deprived the plaintiff of the benefit of its own independent 30-year renewal option," and contend that "[t]he decision as to whether to consent to that 30-year renewal rests entirely with DSL, which now must determine whether or not to consent to the renewal." These assertions fail, because they mischaracterize the parties' obligations under the leases and ignore the basis of LNG's claims in this action. Plaintiff LNG did not bring this action to compel the State, through DSL, to extend the Sublease. Instead, it brought the action in order to compel the Port to seek renewal of the Master Lease and the State's consent to the Port's

extension of the sublease. In failing to seek extension of the Master Lease for a thirty-year period, the Port is depriving LNG of the benefit of its renewal of the sublease for a thirty-year period as well. The Port has sought only a two-year extension, which it cannot seriously contend is either provided for under the terms of the Sublease Agreement or of equivalent value to the thirty-year extension provided for in that agreement. The Sublease Agreement provides LNG the unilateral option to renew the sublease for a thirty-year period. If LNG timely exercises that option, which it has, is a tenant in good standing, which it is, and is not in material default, which it is not, the Port is required to take steps to renew the Master Lease.

### 3. The mutual mistake argument

Defendants have submitted Port Commissioner Daniel Hess's declaration that "we all assumed that in two to three years" Calpine would obtain the necessary permits to construct a plant on the premises. They have also submitted a copy of an e-mail in which former Port Executive Director Gearin stated that a Calpine representative had indicated that obtaining the required permits was "likely to be a two to three-year process." Defendants contend that a "mutual mistake" as to time required to obtain permits excuses the Port from seeking a thirty-year renewal of the Master Lease now. They contend that, because the permits were not secured during the initial five-year lease period, if the Port now exercised its thirty-year option, "it would be obligated to pay DSL the full 30 years of Upland Lease payments without any corresponding guaranteed source of revenue" if plaintiff fails to secure the necessary permits.

This argument fails. Though defendants have presented evidence supporting the conclusion that Commissioner Hess was mistaken as to the time needed to obtain permits, they have not produced evidence supporting the conclusion that the other defendants were likewise mistaken, or provided persuasive support for their assertion that a mistake as to the time required for obtaining permits excuses the Port from performing its contractual obligation to seek renewal of the Master Lease. Even if the parties were mistaken as to the time needed to obtain permits (which the record before the court does not establish), defendants have not demonstrated this mistake was the type of "mutual mistake" that so fundamentally undermined the agreement as to relieve the Port of its contractual obligations. If the timing of the permit process was a significant issue to the Port, it could have negotiated contractual terms to address that matter. It did not.

A "mutual mistake" renders a contract voidable only if a mistake "is so fundamental that it frustrates the purpose of the contract." In re: Woods, 207 Or. App. 452, 463, 142 P.3d 1072 (2006) (citing Lesher v. Strid, 165 Or. App. 34, 42, 916 P.2d 988 (2000)). Even if the record before the court included evidence from which a reasonable trier of fact could conclude that the parties underestimated the time needed to obtain permits, such a mistake would not so "fundamentally frustrate the purpose of the contract" and either invalidate the Sublease Agreement or permit the Port to ignore the provision of that agreement allowing a sublessee to renew the Sublease for a thirty-year period if certain requirements are satisfied.

4. Absence of thirty-year payment guarantee

Defendants' contention that the Port is not required to seek renewal of the Master Lease because there is no guarantee that its sublessee will make the required payments for

FINDINGS AND RECOMMENDATION - 19

thirty years likewise fails. This argument is speculative, and ignores the fact that concerns that a sublessee might fail to perform could have been addressed when the Sublease Agreement was negotiated. There is simply no basis for concluding that, because defendants now raise a concern that the Port did not raise earlier, the Port is not obligated to perform according to the terms of the Sublease Agreement.

### 5. DOJ's investigation of former Port Executive Director Gearin

Since the time that defendants raised concerns about the Oregon Department of Justice's (DOJ's) investigation of former Port Executive Director Gear in's conduct during negotiations of the Master Lease and Sublease Agreement, the DOJ has concluded its investigation. The DOJ has concluded that, while serving as the Executive Director of the Port, Gearin committed official misconduct by securing work at Calpine for his then girlfriend and now wife.

This conclusion does not support defendants' contention that it is not obligated to extend the Master Lease at this time. There is no evidence that impropriety on the part of the former Port Executive Director in any way affected the Port's negotiation of the leases in question, that the Port Commissioners who unanimously voted to approve the leases were misinformed or mislead as to the material terms of the leases, or that execution of the leases was in any manner affected by deceit or fraud on the part of Gearin or anyone else. In the absence of such evidence, the DOJ's investigation provides no basis for the Port to avoid its clear contractual obligations.

FINDINGS AND RECOMMENDATION - 20

## CONCLUSION

Plaintiff's motion for a partial summary judgment establishing that plaintiff has renewed its sublease and that the Port has breached its obligation to LNG by failing to take steps to renew the Master Lease should be granted.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due December 3, 2009. If no objections are filed, the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 17th day of November, 2009.

John Jelderks
U.S. Magistrate Judge